UNITED STATES DISTRICT COURT **FILED**
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITEDHEALTH GROUP INCORPORATED, | : | Civil Action 2010 SEP 16 P 3 58 |
| UNITEDHEALTHCARE SERVICES, INC., | : | |
| UNITEDHEALTHCARE, INC., AMERICHOICE | : | No. _____ U.S. DISTRICT COURT |
| CORPORATION, and GOLDEN RULE | : | BRIDGEPORT, CONN. |
| FINANCIAL CORPORATION, | : | |
| | : | |
| Plaintiffs, | : | **3 1 0 C V 1 4 7 7    J B A** |
| | : | |
| v. | : | |
| | : | |
| APARNA VALLURUPALLI, | : | |
| | : | |
| Defendant. | : | September 16, 2010 |

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiffs UnitedHealth Group Incorporated ("UHG"), UnitedHealthCare Services, Inc.

("UHS"), UnitedHealthcare, Inc. ("UHC"), AmeriChoice Corporation ("AmeriChoice") and

Golden Rule Financial Corporation ("Golden Rule") (collectively, the "UHG Family"), for their

Complaint for Injunctive and Other Relief against Defendant Aparna Vallurupalli

("Vallurupalli"), state as follows:

### NATURE OF THE ACTION

1.      This is an action for breach of contract and threatened and/or actual

misappropriation of trade secrets. The UHG Family seeks temporary, preliminary and

permanent injunctive relief, in addition to other damages.

2.      Until August 23, 2010, Vallurupalli was Vice President of UHC's Innovation

Resource Group and a member of the UHG Innovation Council. In this capacity, Vallurupalli

utilized and had access to highly confidential and proprietary business information, including

information regarding the UHG Family's UnitedHealthOne product, designed to offer coverage

to individuals and families without employer-based insurance; information regarding the development, organization and operation of the Innovation Council; and information regarding the UHG Family's efforts and strategies to succeed in a pre- and post-health care reform environment in both the public and private sectors.

3.      Given her executive position, her access to confidential and proprietary business information and, in return for various Equity Grants, Vallurupalli agreed to certain reasonable post-employment restrictions. Specifically, Vallurupalli agreed that for one year after the end of her employment with UHC, she would not engage or participate in any activity that competes, directly or indirectly, with any of the UHG Family's products or services that she engaged in, participated in, or had confidential information about during her employment with UHC. Vallurupalli also agreed not to use or disclose the UHG Family's confidential and proprietary business information for any purpose other than to further the UHG Family's business.

4.      Despite her contractual obligations, however, Vallurupalli abruptly resigned from UHC and announced her intention to join Centene Corporation ("Centene") – a direct competitor of AmeriChoice (one of UHC's sister companies and a member of the UHG group of companies) in the market for public sector health care programs – as its Senior Vice President of Innovation and Product Development. Additionally, in her new position with Centene, Vallurupalli will be responsible for developing and heading up a group with the same purpose as the UHG Family Innovation Council.

2

5.      By accepting this position with Centene, Vallurupalli is breaching her post-employment contractual obligations owing to the UHG Family – she is taking a high-level executive position with a company that directly competes with the UHG Family in the market for public sector health care, an area of the UHG Family's business about which Vallurupalli possesses highly confidential and proprietary business information, especially with respect to pre- and post-health care reform strategies.

6.      Moreover, prior to resigning from UHC, Vallurupalli downloaded and transferred multiple documents, including, *inter alia*, PowerPoint presentations related to her work on the UHG Innovation Council – containing the UHG Family's confidential and proprietary information relating to ideas, strategies and product development with respect to its business operations in a pre- and post-health care reform environment – which she did not return to the UHG Family upon her sudden departure.

7.      It goes without saying, therefore, that not only is Vallurupalli breaching her post-employment contractual obligations, but she also misappropriated, and threatens to continue to misappropriate, the UHG Family's confidential and proprietary information, which qualify as trade secrets under Connecticut law.

8.      Accordingly, the UHG Family seeks to enjoin Vallurupalli from joining Centene and improperly competing with the UHG Family in violation of her post-employment contractual obligations. Additionally, the UHG Family seeks to prevent Vallurupalli from using or disclosing its trade secrets and other confidential and proprietary business information. Absent such injunctive relief, the UHG Family faces irreparable injury, including the loss of value of its confidential and proprietary information, as well as a loss of goodwill, for which a remedy at law is inadequate.

## PARTIES

9.     UHG is a Minnesota corporation with its principal place of business in Minnetonka, Minnesota.

10.    UHS is a Minnesota corporation with its principal place of business in Minnetonka, Minnesota. UHS is a fully-owned subsidiary of UHG.

11.    UHC is a Delaware corporation with its principal place of business in Edina, Minnesota. UHC is a fully-owned subsidiary of UHG.

12.    AmeriChoice is a Delaware corporation with its principal place of business in Minnetonka, Minnesota. AmeriChoice is a fully-owned subsidiary of UHG.

13.    GRFC is a Delaware corporation with its principal place of business in Indianapolis, Indiana. GRFC is a fully-owned subsidiary of UHG.

14.    Vallurupalli is a citizen of Connecticut who is domiciled at and resides at 43 Brentwood Drive, Glastonbury, Connecticut 06033.

15.    Vallurupalli became an employee of UHC in August 2003. Without any advanced notice, Vallurupalli resigned from UHC on August 23, 2010.

## JURISDICTION AND VENUE

16.    This Court has original jurisdiction over this action under 28 U.S.C. § 1332 because the parties are citizens of different states and the matter in controversy exceeds $75,000.00 excluding interest and costs.

17.    This Court has personal jurisdiction over Vallurupalli, and venue is proper in this District under 28 U.S.C. § 1391(a), because Vallurupalli is a resident of Connecticut and she has breached and threatens to breach contractual duties to the UHG Family in this district.

4

## EVENTS GIVING RISE TO THIS ACTION

### The UHG Family's Business

18.     The UHG Family works to improve our nation's health care system and advance the health and well-being of individuals and communities so that they can enjoy better, fuller lives. The UHG Family helps people make informed health care decisions, prevent illness and simplify the health care system.

19.     To that end, the UHG Family makes significant investments in research and development, technology and business process improvements – nearly $3 billion in the past five years. These investments have led to changes that are improving the way health care is delivered and administered across the entire industry.

20.     As part of the UHG Family, UHC provides health benefit plans for individuals, small- and mid-sized businesses, and large multi-site employers. UHC also offers specialty care programs such as vision and dental care, as well as HSAs (health savings accounts) and HRAs (health reimbursement accounts).

21.     UHC coordinates network-based health and well-being products and services that are innovative, affordable, and keep individuals involved in their own health and wellness. In a complex and ever-evolving health care environment, UHC works to make the health care experience simpler and better for individuals, physicians and employers.

22.     One of UHC's sister companies within the UHG Family is AmeriChoice. AmeriChoice is the nation's premier provider of high quality, personalized public sector health care programs, providing more than three million beneficiaries of Medicaid and other government-sponsored health care programs with health care benefits and services. Centene is one of AmeriChoice's direct competitors.

23.     AmeriChoice has made significant investments in systems and personnel to successfully provide quality products and services to its state customers which in turn provide Medicaid healthcare benefits to qualified recipients.  As a result, AmeriChoice offers health plans that meet the unique needs of the diverse populations it serves.

24.     Like the rest of the UHG Family, AmeriChoice thrives on innovation.  Through technology and research investments that generate creative, "next generation" solutions, as well as through a continual commitment to simplify the health care experience, AmeriChoice is constantly working to develop new approaches that improve health and well-being, and that transform the health care system.

**Vallurupalli's Employment with UHC**

25.     Vallurupalli first began working for UHC on August 4, 2003 as a Strategic Project Manager.  Prior to joining UHC, Vallurupalli had no experience in the health care industry.

26.     From November 2006 until her resignation, Vallurupalli served as Vice President of UHC's Innovation Resource Group.  In that role, Vallurupalli supervised a team of fourteen (14) employees in what is often referred to as UHC's "Innovation Lab."

27.     Along with her team, Vallurupalli was involved in all aspects of research and development relating to UHC's commercial healthcare products, services, capabilities and tools. Vallurupalli collaborated with individuals within UHC and across the UHG Family, along with vendors and key national accounts, to develop and create new and innovative ways to improve the lives and health of the people UHC and the UHG Family serve.

28.     Vallurupalli was also responsible for delivering leading-edge ideas and new products to market, and for developing pilot programs to help implement and deliver them.

29.     More recently, Vallurupalli focused her efforts toward creating and developing ideas that will allow the UHG Family to continue to succeed in a pre- and post-health care reform environment. This involved strategic thinking about what opportunities have been (and/or will be) posed by health care reform, and what products and key attributes the UHG Family can and should develop to put out into the marketplace in order to succeed on those opportunities.

30.     For example, Vallurupalli and the Innovation Lab performed work for UnitedHealthOne, formerly known as Golden Rule, which offers individual and family insurance plans for those who do not have employment-based coverage. Vallurupalli and her team were privy to the UHG Family's confidential strategies and initiatives on how to achieve optimal success in this field.

31.     Vallurupalli was also tasked with analyzing and synthesizing information relating to the legal and regulatory framework of health care reform, from the perspective of how UHC and the UHG Family can use such information to provide a blueprint with respect to new products and services that the UHG Family may offer.

32.     As a part of her more recent work relating to health care reform, Vallurupalli (along with the highly specialized and cutting edge Innovation Resource Group) focused specifically on health insurance exchanges ("Exchanges").

33.     An Exchange is an organized marketplace for the purchase of health insurance to help insurers comply with consumer protections, compete in cost-efficient ways, and to facilitate the expansion of insurance coverage to more people. Exchanges will contract with private insurers (and possibly offer a public plan option) to cover specified populations, such as those currently on Medicaid, those obtaining coverage through small employers and those without

7

employer coverage. A key provision of the 2010 health care reform law requires states to create and maintain an Exchange by January 1, 2014.

34.     When the health care reform law takes effect in 2014, some sixteen (16) million individuals currently insured under public Medicaid programs will enter into state based Exchange insurance programs. In addition, millions of individuals who are uninsured will receive subsidies for publicly run Exchange insurance programs. Consequently, it is likely that more than twenty million people will potentially be looking for insurance through an Exchange.

35.     As a result, the UHG Family has made significant efforts, along with a considerable investment of time and money, to develop unique and proprietary business models and other plans accounting for the changing landscape of health care.

36.     Vallurupalli and the Innovation Resource Group focused their efforts on products that UHC could design and offer, both in public and private Exchanges, as well as products it could design and offer outside of Exchanges in a post-health care reform environment.

**Vallurupalli's Work with UHG's Innovation Council**

37.     As Vice President of UHC's Innovation Resource Group, Vallurupalli was identified as an "Innovation Champion"; *i.e.*, someone within the organization who showed a propensity for coming up with new ideas and who, therefore, received specific innovation training. As a result, Vallurupalli was asked to participate in UHG's Innovation Council ("Innovation Council").

38.     The Innovation Council, which was established in August 2009, is a multidisciplinary group comprised of the CEO or president of each major operating unit within the UHG Family, along with certain select employees, like Vallurupalli. Vallurupalli was a member of the Innovation Council virtually since its inception.

8

39.     The Innovation Council is unique in its structure and focus. It calls upon leaders across the UHG Family to generate innovative ideas, primarily surrounding health care reform, and work to bring those ideas to fruition. The goal of the Innovation Council is to help the UHG companies achieve market expansion. UHG has dedicated millions of dollars of capital to support the Innovation Council's initiatives.

40.     Soon after the group was formed, the Innovation Council hired a third-party consultant to help identify its structure, focus and best opportunities for success. Vallurupalli was involved with and privy to the work the Innovation Council did with this consultant.

41.     Through her active participation in the Innovation Council, Vallurupalli became deeply aware of the overall organization and operation of the Innovation Council. This includes, but is not limited to, insight on how to coordinate work across several entities to reach common goals, how the Innovation Council is structured, how it is staffed, how projects are paced, how projects are funded, how work is delegated, what the Innovation Council's objectives are, and the process by which new initiatives are generated, advanced and ultimately launched. A very limited number of the UHG Family's employees have a full appreciation of the Innovation Council's process and operations and have attended a majority of the Innovation Council's meetings.

42.     The establishment and operation of the Innovation Council is groundbreaking and unique. Needless to say, the UHG Family has dedicated significant resources to it. Its very existence provides the UHG Family with a significant competitive advantage.

43.     Vallurupalli is also intimately familiar with the substance of the Innovation Council's work. Vallurupalli knew what ideas the Innovation Council viewed as potentially successful and worthwhile, as well as those ideas that were not viable or worth pursuing.

44.     To date, the Innovation Council has focused primarily on opportunities surrounding health care reform. For example, it has spent a considerable amount of time developing ideas and strategies relating to how the uninsured population, which will become covered under the new law, will behave in the state-based public Exchange environment.

45.     To that end, Vallurupalli was the co-leader, along with an AmeriChoice employee, of an Innovation Council project that centered around building a model of a public Exchange that AmeriChoice could eventually offer to state customers. AmeriChoice's president was involved in the project as well.

46.     After 2014, insurance companies (like AmeriChoice) will not be able to own or operate Exchanges. However, some states are taking a progressive approach to reform, and are therefore interested in launching an Exchange prior to 2014, when an insurance company will be able to develop and operate an Exchange.

47.     AmeriChoice, therefore, can gain valuable information and a competitive advantage from becoming a "first mover" and operating these Exchanges, including, but not limited to, information regarding how consumers behave, how they select insurance products, where they are willing to make trade-offs, and what factors are important in making that decision. Such information will be critical not only with respect developing an Exchange, but also with respect to designing Exchange-related products and services, including products that will be marketed through Exchanges.

48.     With Vallurupalli at the helm, the Innovation Council's Exchange model project moved beyond the idea stage and towards implementation. For example, the UHG Family invested tens of thousands of dollars and a significant amount of time to have a third-party consultant develop and conduct focus group and other interviews and testing to assist the Innovation Council in creating a proprietary communication vehicle to facilitate an Exchange.

49.     That information contains significant intelligence which is of great importance to the UHG Family, provides it with a competitive advantage and was critical to the Innovation Council in developing the proprietary communication vehicle, and also with respect to designing Exchange-related products and services, including products that will be marketed through Exchanges.

50.     Vallurupalli was intimately involved with the Innovation Council's Exchange model project. She played a role in designing the proprietary communication vehicle based on the data provided from focus groups and other testing. She was also privy to information regarding face-to-face meetings and other correspondence with certain state governments that are interested in developing a health care Exchange prior to 2014.

51.     As a co-leader, Vallurupalli gave periodic project updates to the CEOs or presidents of each major operating unit within the UHG Family, as well as other subsidiaries of UHG who participated in the Innovation Council. Accordingly, she was intimately aware of each and every aspect of the Innovation Council's development efforts and progress with respect to Exchanges.

**UHG's Confidential and Proprietary Information**

52.     Vallurupalli's position as Vice President of UHC's Innovation Resource Group, as well as her role on the UHG Innovation Council, gave Vallurupalli substantial and unfettered access to certain confidential and proprietary business information developed and maintained by the UHG Family.

53.     To be sure, the UHG Family's strategies and efforts made in connection with its individual insurance line are highly confidential and proprietary. So too is the structure and operation of the Innovation Council, along with the information, ideas and strategies developed by it.

54.     Vallurupalli had full access to confidential and proprietary information regarding the operation of the Innovation Council and Innovation Council's Exchange model project, including but not limited to which states are or may be interested in developing or offering an Exchange prior to 2014, strategies for how to market an Exchange to those states, those states' preferences for how an Exchange would operate and specific state proposals.

55.     Vallurupalli also has complete knowledge of how the proprietary communication vehicle was developed, including the results of focus group testing and interviews that formed the basis of its development. Such information, which was developed at great expense, contains significant intelligence that is of great import to the UHG Family, provides it with a competitive advantage and was critical to the Innovation Council in developing the proprietary communication vehicle and Exchange model. Even the delivery of the information was unique in that audio and video from the focus groups were provided to the Innovation Council members (including Vallurupalli) on iPods.

56.     In total, Vallurupalli had intimate knowledge of each and every aspect of the confidential and proprietary information surrounding the UHG Family's investment and involvement in operating the Innovation Council and exploring and developing an Exchange and Exchange-related products and services, including the types of products that will be marketed through Exchanges.

57.     Such confidential business information is known only to certain individuals within the UHG Family, which restricts access to this information and requires that it be kept strictly confidential by its employees.  For example, information relating to the Innovation Council's Exchange model project was disseminated strictly on a need-to-know basis, and only individuals involved in the project had access to such information.

58.     Most (if not all) of the internal documents produced by the Innovation Council relating to the Exchange model project were explicitly designated as confidential and/or indicate that any unauthorized duplication is prohibited.

59.     Additionally, the UHG Family takes specific measures to preserve the confidentiality of its confidential and proprietary information, including, but not limited to:

(a)     Requiring all employees, or employees of any affiliated company, to acknowledge the UHG Code of Conduct and Employee Handbook that prohibits employees from using or disclosing any confidential, proprietary and/or trade secret information belonging to UHG or any of its affiliated companies, including UHS, UHC, AmeriChoice and Golden Rule;

(b)     Including non-disclosure covenants in equity grants awarded to employees;

(c)     Restricting access to computerized information, computer networks and computers through the use of passwords;

(d)     Upon an employee's separation from the UHG Family, disconnecting any passwords that he/she may have been given to access confidential information, and obtaining any and all confidential information in the employee's possession.

60.    The UHG Family rigorously maintains the confidentiality of its confidential business information, including information related to the Innovation Council's Exchange model project and other health care reforms, because such information provides the UHG Family with a competitive advantage in the marketplace from which it derives economic value.

61.    The UHG Family's confidential business information is not generally available to the public, is of great value to the UHG Family and would give any of their competitors who acquired such information an unfair competitive advantage.

62.    A competitor like Centene, for example, could use the Innovation Council's confidential business information to unfairly compete against the UHG Family in a manner that would be harmful to the UHG Family.

63.    Centene's Celtic Group offers individual insurance products that compete with UnitedHealthOne.  If Vallurupalli reveals information regarding UHC's strategies and direction with its individual insurance products, Centene could unfairly compete with it.

64.    Moreover, using the UHG Family's confidential and proprietary information learned from Vallurupalli, Centene could successfully establish and operate a group similar to the Innovation Council without having to undertake any of the efforts or investments that the UHG Family did.  It could also exploit the work performed and resources expended by the Innovation Council.  For example, armed with the UHG Family's highly confidential and proprietary information, it could copy the Innovation Council's Exchange model, know precisely what content to include and know specifically who to market it to without expending the time, resources and/or investment necessary to originally create it.

65.     In other words, a competitor like Centene could use the UHG Family's confidential business information to get an unfair "head start" on new projects and initiatives and move business away from the UHG Family.

**Vallurupalli's Resignation from UHC to Join a Competitor of the UHG Family**

66.     Vallurupalli abruptly resigned from UHC on August 23, 2010 to join Centene as its Senior Vice President of Innovation and Product Development.  In that position, Vallurupalli will be responsible for overseeing new product development and executing new product initiatives. (*See* Centene Corporation Job Description, attached as Exhibit A).  Undoubtedly – and as confirmed by Vallurupalli and representatives of Centene – this involves public sector products and other services relating to Exchanges and the post-health care reform environment. According to Centene, Vallurupalli will also be charged with developing and heading up a group with the same purpose as the Innovation Council.

67.     Upon Vallurupalli announcing her resignation on August 23, 2010, UHC advised her that by accepting employment with Centene and assuming the position of Senior Vice President of Innovation and Product Development, she is violating certain post-employment contractual obligations owing to the UHG Family.

68.     Similarly, on August 27, 2010 UHG's in-house counsel sent Vallurupalli a letter explaining that her proposed employment with Centene violates certain restrictive covenants Vallurupalli is party to.  UHG sent another letter, reiterating its position, on August 31, 2010. (*See* Letters from UHG dated August 27, 2010 and August 31, 2010, attached as Exhibits B and C, respectively).

69.     As explained above, Centene is a multi-line healthcare enterprise that provides programs and related services to under-insured and uninsured individuals, many of whom receive benefits under Medicaid and other state-sponsored programs. Centene is a direct competitor of AmeriChoice, and Centene has confirmed in conversations with UHG's in-house counsel that Vallurupalli's duties and responsibilities at Centene will include work related to post-reform opportunities and innovation work. It will also include her development and oversight of a multidisciplinary innovation group much like the Innovation Council.

70.     Vallurupalli's intimate knowledge of the UnitedHealthOne individual insurance product, the operation of the Innovation Council and the confidential and proprietary information that the UHG Family developed regarding opportunities surrounding health care reform – and more specifically, relating to the Exchange model project – will, if disclosed to Centene and/or used by Vallurupalli on Centene's behalf, give Centene an unfair competitive advantage and cause significant irreparable harm to the UHG Family, including the loss of value of such information, loss of goodwill, as well as damage to the UHG Family's reputation as an industry leader and first mover status.

71.     Vallurupalli will be able to use the information developed by the UHG Family to provide Centene with an unfair head start with respect to individual insurance plans, the establishment and operation of an Innovation Council and developing new ideas and products, including but not limited to, an Exchange model and related products and services which can be marketed to states throughout the country.

72.     Moreover, by accepting the position of Senior Vice President of Innovation and Product Development, where she will be involved in developing new products relating to the public health sector, it is highly unlikely that Vallurupalli will be able to perform her duties and

16

responsibilities without using and/or disclosing the UHG Family's confidential and proprietary information, especially that information relating to its creation and development of an Exchange model, making Vallurupalli's misappropriation of the UHG Family's confidential and proprietary information inevitable.

## Vallurpualli's Failure to Return Electronic Storage Devices Containing the UHG Family's Confidential and Proprietary Information

73.     As noted above, the UHG Family retained a third-party consultant to develop and conduct focus groups and other interviews and testing to assist the Innovation Council in creating its proprietary communication vehicle and develop information that the UHG Family can utilize to design and develop Exchange-related products and services, including products that will be marketed through Exchanges. The confidential and proprietary information that was developed as a result of those efforts contains significant intelligence that is of great importance to the UHG Family, provides it with a competitive advantage and was critical to the Innovation Council in developing the proprietary communication vehicle.

74.     That information – including videos of focus group sessions – and the data that was developed as a result of those focus groups and other testing was loaded onto iPods, and certain members of the Innovation Council, including Vallurupalli, were given those iPods so that they could access that information.

75.     Vallurupalli did not return that iPod when she resigned on August 23, and to date, she has not returned that iPod – which undoubtedly contains the UHG Family's confidential and proprietary information – to the UHG Family.

76.     Similarly, in July of this year, Vallurupalli requested and received permission to use a UnitedHealth Group-approved USB flash drive. Vallurupalli did not return that flash drive when she resigned on August 23, nor has she since returned it to the UHG Family.

17

77. Also, prior to Vallurupalli's request for a company approved USB flash drive, she used two (2) unapproved USB drives to copy certain files from her UHC computer. Like the iPod and her approved USB flash drive, Vallurupalli did not return those flash drives when she resigned on August 23, nor has she since returned them to the UHG Family.

78. In the months just prior to her resignation, it appears that Vallurupalli accessed certain highly confidential and proprietary documents from her work computer, including documents relating to the Innovation Council's Exchange model, and saved them on those devices. For example, in both March in April of this year, Vallurupalli copied highly confidential PowerPoint presentations relating to the Innovation Council's work on Exchanges to the two USB drives.

79. Similarly, in June, Vallurupalli opened a file copied on one of the unauthorized devices entitled "Proposal for a Chief Growth Officer at Centene.ppt." Curiously, the very next day, she accessed a previously saved Innovation Council PowerPoint presentation, relating to Exchanges, from the same drive. Each time Vallurupalli accessed these documents, the UHG Family's security settings triggered a message that reminded Vallurupalli that only approved devices may be used and that "[b]y accepting this prompt you will be held accountable for the contents of the data." Before she could access the documents, Vallurupalli was required to acknowledge and accept the security setting and she did so each time. Again, Vallurupalli did not return those drives when she resigned on August 23, nor has she since returned them to the UHG Family.

**Vallurupalli's Equity Grants and Restrictive Covenants**

80.     As part of Vallurupalli's compensation as a senior executive level employee, she was given a number of stock appreciation rights and restricted stock grants in UHG ("Equity Grants").

81.     For example, on June 5, 2008, Vallurupalli was given stock appreciation rights with respect to 3,205 shares with a grant price of $33.94.  She received subsequent grants of stock appreciation rights of 4,525 shares with a grant price of $29.74 on February 3, 2009, and of 3,802 shares with a grant price of $33.00 on February 9, 2010. (*See* Stock Appreciation Rights Awards, attached as Group Exhibit D).

82.     Also on June 5, 2008, Vallurupalli received 1,721 units of restricted stock.  She was given subsequent grants of 1,538 units and 1,516 units on February 3, 2009 and February 9, 2010, respectively. (*See* Restricted Stock Unit Awards, attached as Group Exhibit E).

83.     As part of each of these Equity Grants, Vallurupalli agreed to abide by certain post-employment contractual obligations. (*See* Group Exs. D and E).

84.     For example, Section 8 of Vallurupalli's February 9, 2010 Restricted Stock Unit Award contained the following restrictive covenants:

(a)     Confidential Information. [Vallurupalli] has or will be given access to and provided with sensitive, confidential, proprietary and/or trade secret information (collectively, "Confidential Information") in the course of [her] employment. Examples of Confidential Information include inventions, new product or marketing plans, business strategies and plans, merger and acquisition targets, financial and pricing information, computer programs, source codes, models and databases, analytical models, customer lists and information, and supplier and vendor lists and information. [Vallurupalli] agrees not to disclose or use Confidential Information, either during or after [her] employment with [the UHG Family], except as necessary to perform [her] duties or as [the UHG Family] may consent in writing.

(b)     Non-Solicitation. During [Vallurupalli]'s employment and for two years after the later of (i) the termination of [Vallurupalli]'s employment for any reason whatsoever or (ii) the last scheduled vesting date under Section 4, [Vallurupalli]

may not, without [the UHG Family's] prior written consent, directly or indirectly, for [Vallurupalli] or for any other person or entity, as agent, employee, officer, director, consultant, owner, principal, partner or shareholder, or in any other individual or representative capacity:

   (i)    Solicit any business competitive with [the UHG Family] from any person or entity who (a) was a [UHG Family] provider or customer within the 12 months before [Vallurupalli's] employment termination and with whom [Vallurupalli] had contact to further [the UHG Family's] business, or for whom [Vallurupalli] provided services or supervised employees who provided those services, or (b) was a prospective provider or customer of [the UHG Family] solicited within the 12 months before [Vallurupalli's] employment termination and with whom [Vallurupalli] had contact for the purposes of soliciting the person or entity to become a provider or customer of [the UHG Family], or supervised employees who had those contacts.

   (ii)   Hire, employ, recruit or solicit any [UHG Family] employee or consultant.

   (iii)  Induce or influence any [UHG Family] employee, consultant or provider to terminate his, her or its employment or other relationship with [the UHG Family].

   (iv)   Assist anyone in any of the activities listed above.

   (c)    <u>Non-Competition</u>. During [Vallurupalli]'s employment and for one year after the later of (i) the termination of [Vallurupalli]'s employment for any reason whatsoever or (ii) the last scheduled vesting date under Section 4, [Vallurupalli] may not, without [the UHG Family's] prior written consent, directly or indirectly, for [Vallurupalli] or for any other person or entity, as agent, employee, officer, director, consultant, owner, principal, partner or shareholder, or in any other individual or representative capacity:

   (i)    Engage in or participate in any activity that competes, directly or indirectly, with any [UHG Family] product or service that [Vallurupalli] engaged in, participated in, or had Confidential Information about during [Vallurupalli]'s employment.

   (ii)   Assist anyone in any of the activities listed above.

(February 9, 2010 Restricted Stock Unit Award § 8, attached as part of <u>Group Ex. E</u>).

85.     Further, Vallurupalli agreed that "the provisions of this Restrictive Covenants section are reasonable and necessary to protect the legitimate interests of [the UHG Family]." *Id.*

86.     The language of the restrictive covenants contained in Section 10 of Vallurupalli's February 9, 2010 Stock Appreciation Rights Award is practically identical to that contained in her Restricted Stock Unit Awards and quoted in Paragraphs 84 and 85. (*See* Group Ex. D).

87.     By accepting her various Equity Grants, Vallurupalli agreed to abide by their terms, including the restrictive covenants set forth above.

88.     Vallurupalli's Equity Grants identify a Minnesota choice of law. (*See* Group Exs. D and E).

89.     In addition to the restrictive covenants contained in her Equity Grants, Vallurupalli agreed not to use or disclose the UHG Family's confidential, proprietary and/or trade secret information through her execution of UHG's "Principles of Integrity & Compliance and Employee Handbook Acknowledgment Form," where she expressly agreed and acknowledged that

> [i]n carrying out my assigned responsibilities as an employee of UnitedHealth Group, I will be given access to and provided with sensitive, confidential, proprietary and/or trade secret information owned by [the UHG Family] and others.  Such information includes the following, by way of example: inventions, new product or marketing plans, business strategies and plans, detailed financial information and pricing information, computer programs, models and databases (including, without limitation, source codes), designs, analytical models, customer lists and customer information, supplier and vendor lists, and supplier and vendor information . . . I agree that I will not disclose or use this sensitive, confidential, proprietary and trade secret information at any time, either during or after the term of my employment, except at the request of [the UHG Family].

(Principles of Integrity & Compliance and Employee Handbook Acknowledgment Form, attached as Exhibit F).

## COUNT I
## BREACH OF CONTRACT

90.     The UHG Family hereby repeats, realleges, and incorporates by reference the

allegations which are contained in Paragraphs 1 through 89.

91.     Each Equity Grant is a valid and enforceable contract.

92.     The UHG Family has performed all of the duties and obligations it agreed to and

owed Vallurupalli under the Equity Grants.

93.     Vallurupalli accepted each Equity Grant on the following dates:

| Award/Grant Date | Date of Acceptance |
|---|---|
| Stock Appreciation Rights Award (6/5/2008) | 7/2/2008 |
| Restricted Stock Unit Award (6/5/2008) | 7/2/2008 |
| Stock Appreciation Rights Award (2/3/2009) | 2/24/2009 |
| Restricted Stock Unit Award (2/3/2009) | 2/24/2009 |
| Stock Appreciation Rights Award (2/9/2010) | 3/1/2010 |
| Restricted Stock Unit Award (2/9/2010) | 3/1/2010 |

94.     The post-employment activity restrictions contained in Vallurupalli's Equity

Grants are reasonable in both scope and duration, and are necessary to protect the UHG Family's

legitimate protectable interests in its confidential business information, as well as its goodwill

and other legitimate business interests.

95.     Vallurupalli has breached those post-employment contractual obligations owing

to the UHG Family by:

(a)     Engaging and/or participating in an activity that competes,
with the UHG Family's products and services that
Vallurupalli engaged in, participated in and had
confidential information about during her employment; and

(b)     Using and/or disclosing the UHG Family's confidential
information to and on behalf of Centene.

96.    As a result of Vallurupalli's breaches of contract, the UHG Family has been irreparably injured, and it continues to face irreparable injury.  the UHG Family is threatened with losing the value of its confidential and proprietary information, first mover status, along with income and goodwill, for which a remedy at law is inadequate.  Accordingly, Vallurupalli must be enjoined and restrained by Order of this Court.

**COUNT II**
**ACTUAL AND/OR THREATENED MISAPPROPRIATION OF TRADE SECRETS**
(CONN. GEN. STAT. §§ 35-50, *et seq.*)

97.    The UHG Family hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 89.

98.    The UHG Family's confidential and proprietary business information includes, *inter alia*, the information, ideas and strategies developed by the Innovation Council relating to its creation and development of an Exchange model and related products.

99.    This information constitutes trade secrets because the UHG Family derives independent economic value from this information not being generally known to the public and not being readily ascertainable by proper means by other persons who could obtain economic value from its disclosure or use, and because the information is the subject of reasonable efforts to maintain its secrecy.

100.    Vallurupalli was obligated by both contract and applicable law to maintain the secrecy of this information.  Nonetheless, she has breached or threatens to breach these duties to the UHG Family by disclosing, threatening to disclose or inevitably disclosing this information to others, including Centene.

101.    Vallurupalli has been or will be unjustly enriched by the threatened and/or actual misappropriation of the UHG Family's trade secrets and, unless restrained, Vallurupalli will continue to use, divulge, threaten to or otherwise misappropriate the UHG Family's trade secrets.

23

102.     Vallurupalli's misappropriation of trade secrets has been willful and malicious.

103.     The UHG Family has been or will be injured, irreparably and otherwise, and is threatened with additional and ongoing injuries as a result of the threatened or actual misappropriation of its trade secrets by Vallurupalli, as alleged above.

104.     As a result of Vallurupalli's misappropriation, the UHG Family is threatened with losing the value of its confidential and proprietary information, first mover status, along with income and goodwill, for which a remedy at law is inadequate.  Accordingly, Vallurupalli must be enjoined and restrained by Order of this Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs UnitedHealth Group Incorporated, UnitedHealthCare Services,

Inc., UnitedHealthcare, Inc., AmeriChoice Corporation and Golden Rule Financial Corporation

seek judgment in their favor and an Order against Defendant Aparna Vallurupalli that grants the

following relief:

(1)     Temporarily, preliminarily and permanently enjoins Vallurupalli, and all
        parties in active concert or participation with her, from engaging in any
        activity that competes, directly or indirectly, with any product or service
        that she engaged in or participated in while employed at UHC or on behalf
        of any of the UHG Family members, or had confidential information about
        during her employment at UHC, including, but not limited to, activities
        related to: a) the development of, service of, or product design for
        Exchanges and communication vehicles for health care Exchanges; b) the
        design of, development of, organization of, funding of, or structuring of a
        group or entity whose purpose is innovation or resembling the UHG
        Family's Innovation Council; and c) the development of, service of, or
        provision of support for individual and family insurance plans for those
        who do not have employment-based coverage, similar to that provided by
        UnitedHealthOne. Accordingly, Vallurupalli should be temporarily,
        preliminarily and permanently enjoined from performing her announced
        job with Centene;

(2)     Temporarily, preliminarily and permanently enjoins Vallurupalli, and all
        parties in active concert or participation with her, from using or disclosing
        any of the UHG Family's proprietary and confidential information
        Vallurupalli obtained or had access to while employed by UHC;

(3)     Orders Vallurupalli and all parties in active concert or participation with
        her to return to the UHG Family all originals and copies of all files,
        devices and/or documents that contain or relate to the UHG Family's
        confidential and proprietary information;

(4)     Requires Vallurupalli to provide a sworn statement and accounting of the
        whereabouts of any and all files, data, devices and information removed
        from the UHG Family;

(5)     Orders Vallurupalli to produce for inspection and imaging all computers
        and other electronic storage devices belonging to, under the control of,
        accessible to, or operated by Vallurupalli;

(6)     Awards the UHG Family compensatory damages to be proven at trial;

(7)    Awards the UHG Family exemplary or punitive damages in an amount to be proven at trial due to Vallurupalli's willful and malicious activities;

(8)    Awards the UHG Family its attorneys fees pursuant to the Connecticut Uniform Trade Secrets Act; and

9)    Awards the UHG Family such further relief as the Court deems necessary and just.

Respectfully submitted,

PLAINTIFFS
UNITEDHEALTH GROUP INCORPORATED
UNITEDHEALTHCARE SERVICES, INC.,
UNITEDHEALTHCARE, INC.,
AMERICHOICE CORPORATION, and
GOLDEN RULE FINANCIAL CORPORATION

By: _____
Douglas J. Varga (ct18885)

ZELDES, NEEDLE & COOPER, P.C.
1000 Lafayette Boulevard
Bridgeport, CT  06604
Tel:  (203) 333-9441
Fax:  (203) 333-1489
E-mail: dvarga@znclaw.com

and

Michael D. Wexler
(*Pro Hac Vice* Application Pending)
Molly M. Joyce
(*Pro Hac Vice* Application Pending)
Jeffrey P. Swatzell
SEYFARTH SHAW LLP
131 South Dearborn Street
Suite 2400
Chicago, Illinois  60603
Tel:  (312) 460-5000
Fax:  (312) 460-7000
E-mail: MWexler@seyfarth.com
          MJoyce@seyfarth.com

Their Attorneys

Exhibit A



## JOB DESCRIPTION

| | |
|---|---|
| **Position Title:** | SVP, Innovation & Product Development |
| **Reporting Relationship:** | EVP, Corporate Development |
| **FLSA Status:** | Exempt |
| **Job Grade:** | Market |

**Position Purpose:**
Oversee new product development and execution of new product initiatives to meet the organization's goals and strategy.  Drive innovation.

**Knowledge/Experience:**
Bachelor's degree or equivalent experience.  8-10 years of related product management or diverse industry experience.  Advanced degree preferred.

**Competencies:**
*Executive*: Integrity, Flexibility, Communication, Critical Thinking, Strategic Thinking, Leadership, Ability to Execute, Business Acumen, Coaching

**Position Responsibilities:**

- Oversee Product Development team to gather requirements to meet the company goals and strategy.

- Oversee Business Development team responsible for responding to RFPs for new Medicaid business in existing markets.

- Research and anticipate business needs in current and potential market segments, and determine the most effective product solutions.

- Determine the long-term vision and direction toward that destination for the product.

- Establish and recommend policies and standards which support the development of assigned product and services.

- Develop and implement monitoring standards to assess product results and performance.

- Represent the company's position on assigned product line issues at the state and national level on regulatory issues, rates, filings, and political questions.

- Work with the Health Plans and Specialty Companies to support products as an internal expert.

- Accountable for aggregate financial and operational product performance.

This job description in no way states or implies that these are the only duties to be performed by the employee(s) occupying this position. Employee(s) may be required to follow other job-related instructions and to perform other job-related duties as requested, subject to all applicable state and federal laws.

7/30/10

Exhibit B



**UnitedHealth Group**

David J. Lauth
Phone: 952.936.7170
Fax:    952.936.1745
Email:  david.lauth@uhc.com

UnitedHealth Group
9900 Bren Rd East Minnetonka MN 55343

August 27, 2010

**VIA E-MAIL AND U.S. MAIL**
Ms. Aparna Vallurupalli
43 Brentwood Dr.
Glastonbury, CT 06033

Dear Ms. Vallurupalli:

    I am employment counsel for UnitedHealth Group ("UHG"). As you know, you received and accepted a number of equity grants during your employment with UHG which included certain restrictive covenants. We have learned about your plans for new employment following your resignation from UHG, and we are concerned that the new employment as we understand it could be in violation of these covenants.

    If you are represented by counsel, please have your counsel contact me immediately. In any event, please be advised before you take any further action to pursue this new employment that UHG intends to take legal action to enforce the covenants if we believe that is warranted and appropriate.

Very truly yours,

David Lauth

David J. Lauth
Senior Associate General Counsel,
Employment Law

Exhibit C



**UnitedHealth Group®**

David J. Lauth
Phone: 952.936.7170
Fax:    952.936.1745
Email: david.lauth@uhc.com

UnitedHealth Group
9900 Bren Rd East Minnetonka MN 55343

August 31, 2010

**VIA E-MAIL AND U.S. MAIL**
Ms. Aparna Vallurupalli
43 Brentwood Dr.
Glastonbury, CT 06033

Dear Ms. Vallurupalli:

I am writing to follow up on my letter of August 27, with respect to your proposed employment at Centene Corporation. I am advised that your anticipated duties at Centene would include work on products that are designed to respond to the impact of health care reform, as well as work involving the new exchanges that will be created. As you know, that is identical to the work in which you have been engaged at UnitedHealth Group ("UHG") and about which you have had access to the organization's most sensitive and confidential information.

I have attached one of the UHG restrictive covenants which you accepted, namely your February 2009 Restricted Stock Unit award. As you will see, Section 7(c) prohibits you from engaging in "any activity that competes, directly or indirectly, with any Company product or service that (you) engaged in, participated in, or had Confidential Information about during (your) employment." As we understand it, undertaking your proposed duties at Centene would constitute a clear breach of this covenant.

We are preparing to commence litigation to enforce your restrictive covenants. If you are represented by counsel, please have your counsel contact me immediately.

Very truly yours,

David J. Lauth
Senior Associate General Counsel,
Employment Law

Attachment



UnitedHealth Group

## RESTRICTED STOCK UNIT AWARD

Award Number:  WA201706

| Award Date | Number of Units | Final Vesting Date |
|---|---|---|
| 02/03/2009 | 1538 | 02/03/2013 |

THIS CERTIFIES THAT UnitedHealth Group Incorporated (the "Company") has on the Award Date specified above granted to

### APARNA VALLURUPALLI

("Participant") an award (the "Award") to receive that number of restricted stock units (the "Restricted Stock Units") indicated above in the box labeled "Number of Units," each Restricted Stock Unit representing the right to receive one share of UnitedHealth Group Incorporated Common Stock, $.01 par value per share (the "Common Stock"), subject to certain restrictions and on the terms and conditions contained in this Award and the UnitedHealth Group Incorporated 2002 Stock Incentive Plan (the "Plan"). A copy of the Plan is available upon request. In the event of any conflict between the terms of the Plan and this Award, the terms of the Plan shall govern. Any terms not defined herein shall have the meaning set forth in the Plan.

\* \* \* \* \*

1.   Rights of the Participant with Respect to the Restricted Stock Units.

(a)   No Shareholder Rights. The Restricted Stock Units granted pursuant to this Award do not and shall not entitle Participant to any rights of a shareholder of Common Stock. The rights of Participant with respect to the Restricted Stock Units shall remain forfeitable at all times prior to the date on which such rights become vested, and the restrictions with respect to the Restricted Stock Units lapse, in accordance with Section 2, 3 or 4.

(b)   Conversion of Restricted Stock Units: Issuance of Common Stock. No shares of Common Stock shall be issued to Participant prior to the date on which the Restricted Stock Units vest, and the restrictions with respect to the Restricted Stock Units lapse, in accordance with Section 2, 3 or 4. Neither this Section 1(b) nor any action taken pursuant to or in accordance with this Section 1(b) shall be construed to create a trust of any kind. After any Restricted Stock Units vest pursuant to Section 2, 3 or 4, the Company shall promptly cause to be issued shares of Common Stock in book-entry form, registered in Participant's name or in the name of Participant's legal representatives, beneficiaries or heirs, as the case may be, in

payment of such vested whole Restricted Stock Units, but in any event, within the period ending on March 15th of the year following the year in which the vesting event occurs (which payment schedule is intended to comply with the "short-term deferral" exemption from the application of Section 409A of the Code), unless such payment is deferred in accordance with the terms and conditions of the Company's non-qualified compensation deferral plans. The value of any fractional Restricted Stock Unit shall be paid in cash at the time shares of Common Stock are delivered to Participant in payment of the Restricted Stock Units.

2.    Vesting. Subject to the terms and conditions of this Award, 25% of the Restricted Stock Units shall vest, and the restrictions with respect to the Restricted Stock Units shall lapse, on each of the first, second, third and fourth anniversaries of the Award Date if Participant remains continuously employed by the Company or continues to serve on the Board of Directors of the Company until the respective vesting dates.

3.    Early Vesting Upon Change in Control. Notwithstanding the other vesting provisions contained in Section 2, but subject to the other terms and conditions set forth herein, upon the effective date of a Change in Control, all of the Restricted Stock Units shall become immediately and unconditionally vested and exercisable, and the restrictions with respect to all of the Restricted Stock Units shall lapse. For purposes of this Award, a "Change in Control" shall mean the sale of all or substantially all of the Company's assets or any merger, reorganization, or exchange or tender offer which, in each case, will result in a change in the power to elect 50% or more of the members of the Board of Directors of the Company.

4.    Termination of Employment.

(a)    Termination of Employment Generally. If, prior to vesting of the Restricted Stock Units pursuant to Section 2 or 3, Participant ceases to be an employee of the Company or any Affiliate, or ceases to serve on the Board of Directors of the Company, for any reason (voluntary or involuntary) other than (i) death or permanent long-term disability, or (ii) a termination that results in severance or separation pay being paid to Participant, and at the time of such termination Participant is not eligible for Retirement (as defined below), then Participant's rights to all of the unvested Restricted Stock Units shall be immediately and irrevocably forfeited on the date of termination.

(b)    Death or Permanent Long-Term Disability. If Participant dies while employed by the Company or any Affiliate, or if Participant's employment by the Company or any Affiliate is terminated due to Participant's failure to return to work as the result of a permanent long-term disability which renders Participant incapable of performing his or her duties as determined under the provisions of the Company's long-term disability insurance program applicable to Participant, then all unvested Restricted Stock Units shall become immediately vested, and the restrictions with respect to all of the Restricted Stock Units shall lapse, as of the date of such death or employment termination.

2

(c)   Severance. If Participant is entitled to severance under the Company's severance pay plan as in effect on the date hereof and the Participant is not eligible for Retirement (as defined below) at the time of termination of employment, then the Restricted Stock Units shall continue to vest, and the restrictions with respect to the Restricted Stock Units shall continue to lapse, for the period of such severance that Participant is eligible to receive. If Participant is entitled to severance under an employment agreement entered into with the Company, then vesting of the Restricted Stock Units, and lapsing of their restrictions, shall continue for the period of such severance that Participant is entitled to receive as of the date hereof. If Participant is entitled to separation pay other than under the Company's severance pay plan or an employment agreement, then vesting of the Restricted Stock Units, and lapsing of their restrictions, shall continue for the lesser of (i) the period Participant would have received payments under the severance pay plan as in effect on the date hereof, had Participant been eligible for such payments or (ii) the period of separation pay. In any case, should Participant be paid in a lump sum versus bi-weekly payments, the Restricted Stock Units shall continue to vest for the period of time in which severance or separation pay would have been paid had it been paid bi-weekly. The rest of this Section 4(c) to the contrary notwithstanding, if any period of severance or separation pay described in Sections 4(c)(i), (ii) or (iii) is of a duration that would have the effect of causing any number of Restricted Stock Units to vest, and the restrictions with respect thereto to lapse, such that the underlying shares of Common Stock would be issued on a date that is after March 15th (the "Acceleration Date") of the year following the calendar year in which the termination of employment occurs, then that number of Restricted Stock Units will automatically vest and the restrictions with respect thereto shall lapse within such time to ensure that the underlying shares of Common Stock will be issued to Participant on or prior to the Acceleration Date.

(d)   Retirement. If the Participant's employment by the Company or any Affiliate is terminated and at the time of termination is eligible for Retirement, then the vesting of the Restricted Stock Units shall continue as if such termination of employment had not occurred, subject to provisions set out in the section entitled "Forfeiture of Restricted Stock Units and Shares of Common Stock" below; provided the Committee or the Chief Executive Officer of the Company may accelerate the lapse of restrictions on such Restricted Stock Units to such an earlier date as the Committee or the Chief Executive Officer of the Company may establish in its or his or her discretion.

(e)   For purposes of this Award, "Retirement" means the termination of employment of a Participant who is age 55 or older with at least ten years of Recognized Employment with the Company or any Affiliate other than by reason of (i) death or permanent long-term disability or (ii) Misconduct.

For purposes of this Award, "Recognized Employment" shall include only employment since the Participant's most recent date of hire by the Company or any Affiliate, and shall not include employment with a company acquired by UnitedHealth Group or any Affiliate before the date of such acquisition.

3

For purposes of this Award, "Misconduct" shall mean a Participant's (a) violation of, or failure to act upon or report known or suspected violations of, the Company's Principles of Ethics and Integrity, or (b) commission of any illegal, fraudulent, or dishonest act or gross negligent or intentional misrepresentation in connection with the Participant's employment.

5.    Restriction on Transfer.   Participant may not transfer the Restricted Stock Units except by will or by the laws of descent and distribution or pursuant to a qualified domestic relations order as defined by the Code or Title I of the Employee Retirement Income Security Act or the rules promulgated thereunder.   Any attempt to otherwise transfer the Restricted Stock Units shall be void.

6.    Forfeiture of Restricted Stock Units and Shares of Common Stock.   This section sets forth circumstances under which Participant shall forfeit all or a portion of the Restricted Stock Units, or be required to repay the Company for the value realized in respect of all or a portion of the Restricted Stock Units.

    (a)   Violation of Restrictive Covenants.   If Participant violates any provision of the Restrictive Covenants set forth in Section 7 below, then any unvested Restricted Stock Units shall be immediately and irrevocably forfeited without any payment therefor. In addition, for any Restricted Stock Units that vested within one year prior to Participant's termination of employment with the Company or any Affiliate or at any time after such termination of employment, the Participant shall be required, upon demand, to repay or otherwise reimburse the Company (including by forfeiting any deferred compensation credits in respect of such Restricted Stock Units under the Company's non-qualified compensation deferral plans) an amount having a value equal to the aggregate Fair Market Value of the shares of Common Stock underlying such Restricted Stock Units on the date the Restricted Stock Units became vested.

    (b)   In General.   This section does not constitute the Company's exclusive remedy for Participant's violation of the Restrictive Covenants. The Company may seek any additional legal or equitable remedy, including injunctive relief, for any such violations. The provisions in this section are essential economic conditions to the Company's grant of Restricted Stock Units to Participant.   By receiving the grant of Restricted Stock Units hereunder, Participant agrees that the Company may deduct from any amounts it owes Participant from time to time (such as wages or other compensation, deferred compensation credits, vacation pay, any severance or other payments owed following a termination of employment, as well as any other amounts owed to the Participant by the Company) to the extent of any amounts Participant owes the Company under this section. The provisions of this section and any amounts repayable by Participant hereunder are intended to be in addition to any rights to repayment the Company may have under Section 304 of the Sarbanes-Oxley Act of 2002 and other applicable law.

7.    Restrictive Covenants.   In consideration of the terms of this Award and Participant's access to Confidential Information, Participant agrees to the Restrictive

4

Covenants set forth below. For purposes of the Restrictive Covenants, the "Company" means UnitedHealth Group and all of its subsidiaries and other affiliates.

(a)   Confidential Information.  Participant has or will be given access to and provided with sensitive, confidential, proprietary and/or trade secret information (collectively, "Confidential Information") in the course of Participant's employment.   Examples of Confidential Information include inventions, new product or marketing plans, business strategies and plans, merger and acquisition targets, financial and pricing information, computer programs, source codes, models and data bases, analytical models, customer lists and information, and supplier and vendor lists and information. Participant agrees not to disclose or use Confidential Information, either during or after Participant's employment with the Company, except as necessary to perform Participant's duties or as the Company may consent in writing.

(b)   Non-Solicitation.  During Participant's employment and for two years after the later of (i) the termination of Participant's employment for any reason whatsoever or (ii) the last scheduled vesting date under Section 4, Participant may not, without the Company's prior written consent, directly or indirectly, for Participant or for any other person or entity, as agent, employee, officer, director, consultant, owner, principal, partner or shareholder, or in any other individual or representative capacity:

> (i)   Solicit any business competitive with the Company from any person or entity who (a) was a Company provider or customer within the 12 months before Participant's employment termination and with whom Participant had contact to further the Company's business, or for whom Participant provided services or supervised employees who provided those services, or (b) was a prospective provider or customer the Company solicited within the 12 months before Participant's employment termination and with whom Participant had contact for the purposes of soliciting the person or entity to become a provider or customer of the Company, or supervised employees who had those contacts.

> (ii)   Hire, employ, recruit or solicit any Company employee or consultant.

> (iii)   Induce or influence any Company employee, consultant, or provider to terminate his, her or its employment or other relationship with the Company.

> (iv)   Assist anyone in any of the activities listed above.

(c)   Non-Competition.  During Participant's employment and for one year after the later of (i) the termination of Participant's employment for any reason whatsoever or (ii) the last scheduled vesting date under Section 4, Participant may not, without the Company's prior written consent, directly or indirectly, for

Participant or for any other person or entity, as agent, employee, officer, director, consultant, owner, principal, partner or shareholder, or in any other individual or representative capacity:

    (i)    Engage in or participate in any activity that competes, directly or indirectly, with any Company product or service that Participant engaged in, participated in, or had Confidential Information about during Participant's employment.

    (ii)    Assist anyone in any of the activities listed above.

(d)    Because the Company's business competes on a nationwide basis, the Participant's obligations under this "Restrictive Covenants" section shall apply on a nationwide basis anywhere in the United States.

(e)    To the extent Participant and the Company agree at any time to enter into separate agreements containing restrictive covenants with different or inconsistent terms than those contained herein, Participant and the Company acknowledge and agree that such different or inconsistent terms shall not in any way affect or have relevance to the Restrictive Covenants contained herein.

By accepting this Restricted Stock Unit Award, Participant agrees that the provisions of this Restrictive Covenants section are reasonable and necessary to protect the legitimate interests of the Company.

8.    Adjustments to Restricted Stock Units. In the event that any dividend or other distribution (whether in the form of cash, shares of Common Stock, other securities or other property), recapitalization, stock split, reverse stock split, reorganization, merger, consolidation, split-up, spin-off, combination, repurchase or exchange of Common Stock or other securities of the Company or other similar corporate transaction or event affecting the Common Stock would be reasonably likely to result in the diminution or enlargement of any of the benefits or potential benefits intended to be made available under the Award (including, without limitation, the benefits or potential benefits of provisions relating to the vesting of the Restricted Stock Units), the Committee shall, in such manner as it shall deem equitable or appropriate in order to prevent such diminution or enlargement of any such benefits or potential benefits, make adjustments to the Award, including adjustments in the number and type of shares of Common Stock Participant would have received upon vesting of the Restricted Stock Units; provided, however, that the number of shares into which the Restricted Stock Units may be converted shall always be a whole number.

9.    Tax Matters.

(a)    In order to comply with all applicable federal, state and local tax laws or regulations, the Company may take such action as it deems appropriate to ensure

6

that all applicable federal, state and local payroll, withholding, income or other taxes, which are the sole and absolute responsibility of Participant, are withheld or collected from Participant.

(b)     On each applicable vesting date, Participant will be deemed to have elected to satisfy Participant's minimum required federal, state, and local payroll, withholding, income or other tax withholding obligations arising from the receipt of shares or the lapse of restrictions relating to the Restricted Stock Units, by having the Company withhold a portion of the shares of Common Stock otherwise to be delivered having a Fair Market Value equal to the amount of such taxes (but only to the extent of the minimum amount required to be withheld under applicable laws or regulations), unless, on or before the applicable vesting date, Participant notifies the Company that Participant has elected, and makes appropriate arrangements, to deliver cash, check (bank check, certified check or personal check) or money order payable to the Company.

10.     Miscellaneous.

(a)     This Award does not confer on Participant any right with respect to the continuance of any relationship with the Company or any Affiliate, nor will it interfere in any way with the right of the Company to terminate such relationship at any time.

(b)     Neither the Plan nor this Award shall create or be construed to create a trust or separate fund of any kind or a fiduciary relationship between the Company or any Affiliate and Participant or any other Person.  To the extent that any Person acquires a right to receive payments from the Company or any Affiliate pursuant to an Award, such right shall be no greater than the right of any unsecured creditor of the Company or any Affiliate.

(c)     The Company shall not be required to deliver any shares of Common Stock upon the vesting of any Restricted Stock Units until the requirements of any federal or state securities laws, rules or regulations or other laws or rules (including the rules of any securities exchange) as may be determined by the Company to be applicable have been and continue to be satisfied (including an effective registration of the shares under federal and state securities laws).

(d)     An original record of this Award and all the terms hereof, executed by the Company, is held on file by the Company.  To the extent there is any conflict between the terms contained in this Award and the terms contained in the original held by the Company, the terms of the original held by the Company shall control.

(e)     If a court or arbitrator decides that any provision of this Award is invalid or overbroad, Participant agrees that the court or arbitrator should narrow such provision so that it is enforceable or, if narrowing is not possible or permissible, such provision should be considered severed and the other provisions of this Award should be unaffected.

7

(f)     Participant agrees that (i) legal remedies (money damages) for any breach of the Restrictive Covenants in Section 7 will be inadequate, (ii) the Company will suffer immediate and irreparable harm from any such breach, and (iii) the Company will be entitled to injunctive relief from a court in addition to any legal remedies the Company may seek in arbitration.

(g)     The Restrictive Covenants in this Award and the provisions regarding the forfeiture of Restricted Stock Units and shares of Common Stock shall survive termination of the Restricted Stock Units.

(h)     The validity, construction and effect of this Award and any rules and regulations relating to this Award shall be determined in accordance with the laws of the State of Minnesota (without regard to its conflict of law principles).

8

Exhibit D



UnitedHealth Group

## STOCK APPRECIATION RIGHTS AWARD
### (STOCK SETTLED)

Award Number: YD220910

| Award Date | Number of Shares | Grant Price | Expiration Date |
|---|---|---|---|
| 02/09/2010 | 3802 | $33.00 | 02/09/2020 |

THIS CERTIFIES THAT UnitedHealth Group Incorporated (the "Company") has on the Award Date specified above granted to

### APARNA VALLURUPALLI

("Participant") stock appreciation rights (the "Stock Appreciation Rights") with respect to the number of shares of UnitedHealth Group Incorporated Common Stock, $.01 par value per share (the "Common Stock"), indicated above in the box labeled "Number of Shares" (the "Shares"). The initial value of each Share is indicated above in the box labeled "Grant Price." This Award represents the right to receive shares of Common Stock (the "Issued Shares") only when, and with respect to the number of Shares as to which, the Award has vested (the "Vested Shares"). This Award is subject to the terms and conditions set forth below and in the UnitedHealth Group Incorporated 2002 Stock Incentive Plan (the "Plan"). A copy of the Plan is available upon request. In the event of any conflict between the terms of the Plan and this Award, the terms of the Plan shall govern. Any terms not defined herein shall have the meaning set forth in the Plan.

* * * * *

1.     Rights of the Participant with Respect to the Stock Appreciation Rights.

(a)     No Shareholder Rights. The Stock Appreciation Rights granted pursuant to this Award do not and shall not entitle Participant to any rights of a shareholder of Common Stock prior to the exercise of the Stock Appreciation Rights and the receipt of the Issued Shares in accordance with this Award. The rights of Participant with respect to this Award shall remain forfeitable at all times prior to the date on which such rights become vested in accordance with Section 2, 3 or 4 hereof.

(b)     Exercise of Stock Appreciation Rights; Issuance of Common Stock. No shares of Common Stock shall be issued to Participant prior to the date on which the Stock Appreciation Rights are vested in accordance with Sections 2, 3, or 4, and exercised in accordance with Section 5. Upon exercise of the Stock Appreciation Rights, Participant shall be entitled to receive a number of Issued Shares for each Vested Share with respect to which the Stock

Appreciation Rights are exercised equal to (i) the excess of the Fair Market Value of one Share on the date of exercise over the Grant Price, divided by (ii) the Fair Market Value of one Share on the date of exercise. The Issued Shares shall be issued in book-entry form, registered in Participant's name or in the name of Participant's legal representatives, beneficiaries or heirs, as the case may be. The Company will not deliver any fractional share of Common Stock but will pay, in lieu thereof, cash equal to the Fair Market Value of such fractional share.

2.      Vesting.    Subject to the terms and conditions of this Award, the Stock Appreciation Rights shall vest and may be exercised by Participant with respect to 25% of the Shares on each of the first, second, third and fourth anniversaries of the Award Date if Participant remains continuously employed by the Company or any Affiliate until the respective vesting dates.

3.      Early Vesting Upon Change in Control.    Notwithstanding the other vesting provisions contained in Section 2, but subject to the other terms and conditions set forth herein, upon the effective date of a Change in Control, the Stock Appreciation Rights with respect to all of the Shares shall become immediately and unconditionally vested and exercisable.   For purposes of this Award, a "Change in Control" shall mean the sale of all or substantially all of the Company's assets or any merger, reorganization, or exchange or tender offer which, in each case, will result in a change in the power to elect 50% or more of the members of the Board of Directors of the Company.

4.      Forfeiture or Early Vesting Upon Termination of Employment.

(a)      Termination of Employment Generally.   If Participant ceases to be an employee of the Company or any Affiliate for any reason (voluntary or involuntary) other than (i) death or permanent long-term disability, or (ii) a termination that results in severance or separation pay being paid to Participant, and at the time of such termination Participant is not eligible for Retirement (as defined below), then Participant may at any time within the Exercise Period (as defined below) exercise the Stock Appreciation Rights with respect to the Vested Shares on the date of the termination.   Participant's Stock Appreciation Rights with respect to any unvested Shares shall be immediately and irrevocably forfeited on the date of termination.

(b)      Death or Permanent Long-Term Disability.   If Participant dies while employed by the Company or any Affiliate, or if Participant's employment by the Company or any Affiliate is terminated due to Participant's failure to return to work as the result of a permanent long-term disability which renders Participant incapable of performing his or her duties as determined under the provisions of the Company's long-term disability insurance program applicable to Participant, then (i) the Stock Appreciation Rights with respect to any unvested Shares shall immediately vest, and (ii) Participant (or Participant's personal representatives, administrators or guardians, as applicable, or any person or persons to whom the Stock Appreciation Rights are transferred by will or the applicable laws of descent and distribution) may, subject to Section 8, at any time within a period of five years after the Participant's death or termination of employment due to the Participant's failure to return to work as the result of a permanent long-term disability, or for such other longer period established at the discretion of the Committee, exercise the Stock Appreciation Rights to the extent of the full number of Vested Shares.

2

(c)     Severance.  If Participant is entitled to severance under the Company's severance pay plan as in effect on the date hereof and the Participant is not eligible for Retirement (as defined below) at the time of termination of employment, then the Stock Appreciation Rights shall continue to vest for the period of such severance that Participant is eligible to receive.  If Participant is entitled to severance under an employment agreement entered into with the Company, then vesting of the Stock Appreciation Rights shall continue for the period of such severance that Participant is entitled to receive as of the date hereof.  If Participant is entitled to separation pay other than under the Company's severance pay plan or an employment agreement, then vesting of the Stock Appreciation Rights shall continue for the lesser of (i) the period Participant would have received payments under the severance pay plan as in effect on the date hereof, had Participant been eligible for such payments or (ii) the period of separation pay.  In either case, should Participant be paid in a lump sum versus bi-weekly payments, the Stock Appreciation Rights shall continue to vest for the period of time in which severance or separation pay would have been paid had it been paid bi-weekly.

(d)     Retirement.  If the Participant's employment by the Company or any Affiliate is terminated and at the time of termination is eligible for Retirement, then (i) vesting of the Stock Appreciation Rights shall continue as if such termination of employment had not occurred and (ii) the Participant may, at any time within the shorter of (1) the Expiration Date of the Award or (2) a period of five years after such termination of employment by reason of the Participant's Retirement or for such other longer period established at the discretion of the Committee, exercise the Stock Appreciation Rights to the extent of the full number of Vested Shares which are exercisable and which the Participant is entitled to purchase under the Stock Appreciation Rights on the date of exercise of the Award; provided that the Award shall continue to be subject to "Forfeiture of Stock Appreciation Rights and Shares" below.

(e)     For purposes of this Award, "Exercise Period" means the greater of (i) a period of three months after the date of termination of Participant's employment, (ii) if Participant is entitled to severance or separation pay, a period of three months after vesting ceases as provided in (c) above, or (iii) such other longer period established at the discretion of the Committee.  Notwithstanding any other provision of this Agreement, the Stock Appreciation Rights shall in no event be exercisable to any extent or by any Person after the Expiration Date.

For purposes of this Award, "Retirement" means the termination of employment of a Participant who is age 55 or older with at least ten years of Recognized Employment with the Company or any Affiliate other than by reason of (i) death or permanent long-term disability or (ii) Misconduct.

For purposes of this Award, "Recognized Employment" shall include only employment since the Participant's most recent date of hire by the Company or any Affiliate, and shall not include employment with a company acquired by UnitedHealth Group or any Affiliate before the date of such acquisition.

For purposes of this Award, "Misconduct" shall mean a Participant's (a) violation of, or failure to act upon or report known or suspected violations of, the Company's Principles of Ethics and Integrity, or (b) commission of any illegal, fraudulent, or dishonest act or gross negligent or intentional misrepresentation in connection with the Participant's employment.

3

5.     Method of Exercise.   The Stock Appreciation Rights may be exercised with respect to Vested Shares by delivery to the Company of a written notice which shall state that Participant elects to exercise the Stock Appreciation Rights as to the number of Vested Shares specified in the notice as of the date specified in the notice.

6.     Restriction on Transfer.   During Participant's lifetime, the Stock Appreciation Rights shall be exercisable only by Participant.   Participant may not transfer the Stock Appreciation Rights except by will or by the laws of descent and distribution or pursuant to a qualified domestic relations order as defined by the Code or Title I of the Employee Retirement Income Security Act or the rules promulgated thereunder.  Any attempt to otherwise transfer the Stock Appreciation Rights shall be void.

7.     Special Restriction on Transfer for Certain Participants.   If Participant is an officer of the Company within the meaning of Section 16 of the Securities Exchange Act of 1934 and Rule 16a-1 issued thereunder, as such status is reasonably determined from time to time by the Board of Directors of the Company (a "Section 16 Officer"), at any time that the Stock Appreciation Rights are exercised in whole or in part and the Company has theretofore communicated Participant's status as a Section 16 Officer to Participant, the following special transfer restrictions apply to any shares of Common Stock acquired upon the exercise of the Stock Appreciation Rights.  One third (1/3) of the net number of any shares of Common Stock acquired upon the exercise of the Stock Appreciation Rights at a time when Participant is a Section 16 Officer (including any shares of Common Stock or other securities subject to the Stock Appreciation Rights following any adjustment made pursuant to this Award or Section 7 of the Plan) must be retained, and may not be sold or otherwise transferred, for a period of at least one year following the date the Stock Appreciation Rights are exercised.  For purposes of this Award, the "net number of any shares of Common Stock issued" shall mean the number of Issued Shares received with respect to a particular exercise pursuant to Section 1(b) after reduction for any shares of Common Stock withheld by or tendered to the Company, or sold on the market, to cover any federal, state, local or other payroll, withholding, income or other applicable tax withholding required in connection with the exercise of the Stock Appreciation Rights.  The restrictions of this Section 7 are in addition to, and not in lieu of, the restrictions imposed under other Company policies and applicable laws.

8.     Termination.  The Stock Appreciation Rights granted pursuant to this Award shall terminate on the earlier to occur of (a) the date indicated above in the box labeled "Expiration Date" or (b) as provided in Section 4 above.

9.     Forfeiture of Stock Appreciation Rights and Shares.  This section sets forth circumstances under which Participant shall forfeit all or a portion of the Stock Appreciation Rights, or be required to repay the Company for the value realized in respect of all or a portion of the Stock Appreciation Rights.

(a)     Violation of Restrictive Covenants.  If Participant violates any provision of the Restrictive Covenants in Section 10, then (i) any unvested Stock Appreciation Rights and (ii) any Stock Appreciation Rights that vested within one year prior to Participant's termination

4

of employment with the Company or any Affiliate or at any time after such termination of employment (the "Forfeited SARs") and that have not been exercised shall be immediately cancelled and rendered null and void without any payment therefor. If any such Forfeited SARs have been exercised prior to Participant's violation of the Restrictive Covenants, Participant shall be required to repay or otherwise reimburse the Company, upon demand, an amount in cash or Common Stock having a value equal to the amount described in clause (i) or (ii), depending on whether the Participant still holds the Shares received upon exercise of the Forfeited SARs; (i) to the extent that such Shares have been sold, the aggregate proceeds received from such sale of Shares, and (ii) to the extent that such Shares have not been sold at the time Company demand is made, the aggregate Fair Market Value of such Shares on the date the Forfeited SARs were exercised.

(b)      In General.  This section does not constitute the Company's exclusive remedy for Participant's violation of the Restrictive Covenants. The Company may seek any additional legal or equitable remedy, including injunctive relief, for any such violations. The provisions in this section are essential economic conditions to the Company's grant of Stock Appreciation Rights to Participant.  By receiving the grant of Stock Appreciation Rights hereunder, Participant agrees that the Company may deduct from any amounts it owes Participant from time to time (such as wages or other compensation, deferred compensation credits, vacation pay, any severance or other payments owed following a termination of employment, as well as any other amounts owed to the Participant by the Company) to the extent of any amounts Participant owes the Company under this section. The provisions of this section and any amounts repayable by Participant hereunder are intended to be in addition to any rights to repayment the Company may have under Section 304 of the Sarbanes-Oxley Act of 2002 and other applicable law.

10.      Restrictive Covenants.   In consideration of the terms of this Award and Participant's access to Confidential Information, Participant agrees to the Restrictive Covenants set forth below. For purposes of the Restrictive Covenants, the "Company" means UnitedHealth Group and all of its subsidiaries and other affiliates.

(a)      Confidential Information.  Participant has or will be given access to and provided with sensitive, confidential, proprietary and/or trade secret information (collectively, "Confidential Information") in the course of Participant's employment.    Examples of Confidential Information include inventions, new product or marketing plans, business strategies and plans, merger and acquisition targets, financial and pricing information, computer programs, source codes, models and data bases, analytical models, customer lists and information, and supplier and vendor lists and information. Participant agrees not to disclose or use Confidential Information, either during or after Participant's employment with the Company, except as necessary to perform Participant's duties or as the Company may consent in writing.

(b)      Non-Solicitation.  During Participant's employment and for the greater of two years after the termination of Participant's employment for any reason whatsoever or the period of time during which the Stock Appreciation Rights remain exercisable, Participant may not, without the Company's prior written consent, directly or indirectly, for Participant or for any other person or entity, as agent, employee, officer, director, consultant, owner, principal, partner or shareholder, or in any other individual or representative capacity:

5

    (i)       Solicit any business competitive with the Company from any person or entity who (a) was a Company provider or customer within the 12 months before Participant's employment termination and with whom Participant had contact to further the Company's business, or for whom Participant provided services or supervised employees who provided those services, or (b) was a prospective provider or customer the Company solicited within the 12 months before Participant's employment termination and with whom Participant had contact for the purposes of soliciting the person or entity to become a provider or customer of the Company, or supervised employees who had those contacts.

    (ii)     Hire, employ, recruit or solicit any Company employee or consultant.

    (iii)    Induce or influence any Company employee, consultant, or provider to terminate his, her or its employment or other relationship with the Company.

    (iv)    Assist anyone in any of the activities listed above.

    (c)    Non-Competition. During Participant's employment and for the greater of one year after the termination of Participant's employment for any reason whatsoever or the period of time during which the which the Stock Appreciation Rights remain exercisable, Participant may not, without the Company's prior written consent, directly or indirectly, for Participant or for any other person or entity, as agent, employee, officer, director, consultant, owner, principal, partner or shareholder, or in any other individual or representative capacity:

    (i)       Engage in or participate in any activity that competes, directly or indirectly, with any Company product or service that Participant engaged in, participated in, or had Confidential Information about during Participant's employment.

    (ii)     Assist anyone in any of the activities listed above.

    (d)    Because the Company's business competes on a nationwide basis, the Participant's obligations under this "Restrictive Covenants" section shall apply on a nationwide basis anywhere in the United States.

    (e)    To the extent Participant and the Company agree at any time to enter into separate agreements containing restrictive covenants with different or inconsistent terms than those contained herein, Participant and the Company acknowledge and agree that such different or inconsistent terms shall not in any way affect or have relevance to the Restrictive Covenants contained herein.

6

By accepting this Stock Appreciation Right, Participant agrees that the provisions of this Restrictive Covenants section are reasonable and necessary to protect the legitimate interests of the Company.

11.     Adjustments to Stock Appreciation Rights.  In the event that any dividend or other distribution (whether in the form of cash, shares of Common Stock, other securities or other property), recapitalization, stock split, reverse stock split, reorganization, merger, consolidation, split-up, spin-off, combination, repurchase or exchange of Common Stock or other securities of the Company or other similar corporate transaction or event affecting the Common Stock would be reasonably likely to result in the diminution or enlargement of any of the benefits or potential benefits intended to be made available under the Award (including, without limitation, the benefits or potential benefits of provisions relating to the term, vesting or exercisability of the Stock Appreciation Rights), the Committee shall, in such manner as it shall deem equitable or appropriate in order to prevent such diminution or enlargement of any such benefits or potential benefits, make adjustments to the Award, including adjustments in the number and type of Shares subject to the Stock Appreciation Rights; provided, however, that the number of shares of Common Stock into which the Stock Appreciation Rights may be exercised shall always be a whole number.

12.     Tax Matters.

(a)     In order to comply with all applicable federal, state and local tax laws or regulations, the Company may take such action as it deems appropriate to ensure that all applicable federal, state and local payroll, withholding, income or other taxes, which are the sole and absolute responsibility of Participant, are withheld or collected from Participant.

(b)     Upon each exercise of Stock Appreciation Rights hereunder, Participant will be deemed to have elected to satisfy Participant's minimum required federal, state, and local payroll, withholding, income or other tax withholding obligations arising from the exercise of Stock Appreciation Rights or the receipt of Issued Shares by having the Company withhold a portion of the Issued Shares otherwise to be delivered having a Fair Market Value equal to the amount of such taxes (but only to the extent of the minimum amount required to be withheld under applicable laws or regulations), unless, on or before the date of exercise, Participant notifies the Company that Participant has elected, and makes appropriate arrangements, to deliver cash, check (bank check, certified check or personal check) or money order payable to the Company.

13.     Miscellaneous.

(a)     This Award does not confer on Participant any right with respect to the continuance of any relationship with the Company or any Affiliate, nor will it interfere in any way with the right of the Company to terminate such relationship at any time.

(b)     Neither the Plan nor this Award shall create or be construed to create a trust or separate fund of any kind or a fiduciary relationship between the Company or any Affiliate and

7

Participant or any other Person. To the extent that any Person acquires a right to receive payments from the Company or any Affiliate pursuant to an Award, such right shall be no greater than the right of any unsecured creditor of the Company or any Affiliate.

(c)     The Company shall not be required to issue or deliver any shares of Common Stock upon exercise of any Stock Appreciation Rights until the requirements of any federal or state securities laws, rules or regulations or other laws or rules (including the rules of any securities exchange) as may be determined by the Company to be applicable have been and continue to be satisfied (including an effective registration of the shares under federal and state security laws).

(d)     An original record of this Award and all the terms hereof, executed by the Company, is held on file by the Company. To the extent there is any conflict between the terms contained in this Award and the terms contained in the original held by the Company, the terms of the original held by the Company shall control.

(e)     If a court or arbitrator decides that any provision of this Award is invalid or overbroad, Participant agrees that the court or arbitrator should narrow such provision so that it is enforceable or, if narrowing is not possible or permissible, such provision should be considered severed and the other provisions of this Award should be unaffected.

(f)     Participant agrees that (i) legal remedies (money damages) for any breach of the Restrictive Covenants in Section 10 will be inadequate, (ii) the Company will suffer immediate and irreparable harm from any such breach, and (iii) the Company will be entitled to injunctive relief from a court in addition to any legal remedies the Company may seek in arbitration.

(g)     The Restrictive Covenants and the provisions regarding forfeiture of the Stock Appreciation Rights and Shares in this Award shall survive termination of the Stock Appreciation Rights.

(h)     The validity, construction and effect of this Award and any rules and regulations relating to this Award shall be determined in accordance with the laws of the State of Minnesota (without regard to its conflict of law principles).



UnitedHealth Group

## STOCK APPRECIATION RIGHTS AWARD
## (STOCK SETTLED)

Award Number:  YA201721

| Award Date | Number of Shares | Grant Price | Expiration Date |
|------------|------------------|-------------|-----------------|
| 02/03/2009 | 4525 | $29.74 | 02/03/2019 |

THIS CERTIFIES THAT UnitedHealth Group Incorporated (the "Company") has on the Award Date specified above granted to

### APARNA VALLURUPALLI

("Participant") stock appreciation rights (the "Stock Appreciation Rights") with respect to the number of shares of UnitedHealth Group Incorporated Common Stock, $.01 par value per share (the "Common Stock"), indicated above in the box labeled "Number of Shares" (the "Shares"). The initial value of each Share is indicated above in the box labeled "Grant Price." This Award represents the right to receive shares of Common Stock (the "Issued Shares") only when, and with respect to the number of Shares as to which, the Award has vested (the "Vested Shares"). This Award is subject to the terms and conditions set forth below and in the UnitedHealth Group Incorporated 2002 Stock Incentive Plan (the "Plan"). A copy of the Plan is available upon request. In the event of any conflict between the terms of the Plan and this Award, the terms of the Plan shall govern. Any terms not defined herein shall have the meaning set forth in the Plan.

* * * * *

1.  Rights of the Participant with Respect to the Stock Appreciation Rights.

(a)  No Shareholder Rights.  The Stock Appreciation Rights granted pursuant to this Award do not and shall not entitle Participant to any rights of a shareholder of Common Stock prior to the exercise of the Stock Appreciation Rights and the receipt of the Issued Shares in accordance with this Award. The rights of Participant with respect to this Award shall remain forfeitable at all times prior to the date on which such rights become vested in accordance with Section 2, 3 or 4 hereof.

(b)  Exercise of Stock Appreciation Rights; Issuance of Common Stock.  No shares of Common Stock shall be issued to Participant prior to the date on which the Stock Appreciation Rights are vested in accordance with Sections 2, 3, or 4, and exercised in accordance with Section 5.  Upon exercise of the Stock Appreciation Rights, Participant shall be entitled to receive a number of Issued Shares for each Vested Share with respect to which the Stock

Case 3:10-cv-01477-JBA Document 1 Filed 09/16/10 Page 51 of 91

Appreciation Rights are exercised equal to (i) the excess of the Fair Market Value of one Share on the date of exercise over the Grant Price, divided by (ii) the Fair Market Value of one Share on the date of exercise. The Issued Shares shall be issued in book-entry form, registered in Participant's name or in the name of Participant's legal representatives, beneficiaries or heirs, as the case may be. The Company will not deliver any fractional share of Common Stock but will pay, in lieu thereof, cash equal to the Fair Market Value of such fractional share.

2.    Vesting.    Subject to the terms and conditions of this Award, the Stock Appreciation Rights shall vest and may be exercised by Participant with respect to 25% of the Shares on each of the first, second, third and fourth anniversaries of the Award Date if Participant remains continuously employed by the Company or any Affiliate until the respective vesting dates.

3.    Early Vesting Upon Change in Control.    Notwithstanding the other vesting provisions contained in Section 2, but subject to the other terms and conditions set forth herein, upon the effective date of a Change in Control, the Stock Appreciation Rights with respect to all of the Shares shall become immediately and unconditionally vested and exercisable. For purposes of this Award, a "Change in Control" shall mean the sale of all or substantially all of the Company's assets or any merger, reorganization, or exchange or tender offer which, in each case, will result in a change in the power to elect 50% or more of the members of the Board of Directors of the Company.

4.    Forfeiture or Early Vesting Upon Termination of Employment.

(a)    Termination of Employment Generally.    If Participant ceases to be an employee of the Company or any Affiliate for any reason (voluntary or involuntary) other than (i) death or permanent long-term disability, or (ii) a termination that results in severance or separation pay being paid to Participant, and at the time of such termination Participant is not eligible for Retirement (as defined below), then Participant may at any time within the Exercise Period (as defined below) exercise the Stock Appreciation Rights with respect to the Vested Shares on the date of the termination. Participant's Stock Appreciation Rights with respect to any unvested Shares shall be immediately and irrevocably forfeited on the date of termination.

(b)    Death or Permanent Long-Term Disability.    If Participant dies while employed by the Company or any Affiliate, or if Participant's employment by the Company or any Affiliate is terminated due to Participant's failure to return to work as the result of a permanent long-term disability which renders Participant incapable of performing his or her duties as determined under the provisions of the Company's long-term disability insurance program applicable to Participant, then (i) the Stock Appreciation Rights with respect to any unvested Shares shall immediately vest, and (ii) Participant (or Participant's personal representatives, administrators or guardians, as applicable, or any person or persons to whom the Stock Appreciation Rights are transferred by will or the applicable laws of descent and distribution) may, subject to Section 7, at any time within a period of five years after the Participant's death or termination of employment due to the Participant's failure to return to work as the result of a permanent long-term disability, or for such other longer period established at the discretion of the Committee or the Chief Executive Officer of the Company, exercise the Stock Appreciation Rights to the extent of the full number of Vested Shares.

2

(c)    Severance. If Participant is entitled to severance under the Company's severance pay plan as in effect on the date hereof and the Participant is not eligible for Retirement (as defined below) at the time of termination of employment, then the Stock Appreciation Rights shall continue to vest for the period of such severance that Participant is eligible to receive. If Participant is entitled to severance under an employment agreement entered into with the Company, then vesting of the Stock Appreciation Rights shall continue for the period of such severance that Participant is entitled to receive as of the date hereof. If Participant is entitled to separation pay other than under the Company's severance pay plan or an employment agreement, then vesting of the Stock Appreciation Rights shall continue for the lesser of (i) the period Participant would have received payments under the severance pay plan as in effect on the date hereof, had Participant been eligible for such payments or (ii) the period of separation pay. In either case, should Participant be paid in a lump sum versus bi-weekly payments, the Stock Appreciation Rights shall continue to vest for the period of time in which severance or separation pay would have been paid had it been paid bi-weekly.

(d)    Retirement. If the Participant's employment by the Company or any Affiliate is terminated and at the time of termination is eligible for Retirement, then (i) vesting of the Stock Appreciation Rights shall continue as if such termination of employment had not occurred and (ii) the Participant may, at any time within the shorter of (1) the Expiration Date of the Award or (2) a period of five years after such termination of employment by reason of the Participant's Retirement or for such other longer period established at the discretion of the Committee or the Chief Executive Officer of the Company, exercise the Stock Appreciation Rights to the extent of the full number of Vested Shares which are exercisable and which the Participant is entitled to purchase under the Stock Appreciation Rights on the date of exercise of the Award; provided that the Award shall continue to be subject to "Forfeiture of Stock Appreciation Rights and Shares" below.

(e)    For purposes of this Award, "Exercise Period" means the greater of (i) a period of three months after the date of termination of Participant's employment, (ii) if Participant is entitled to severance or separation pay, a period of three months after vesting ceases as provided in (c) above, or (iii) such other longer period established at the discretion of the Committee or the Chief Executive Officer of the Company. Notwithstanding any other provision of this Agreement, the Stock Appreciation Rights shall in no event be exercisable to any extent or by any Person after the Expiration Date.

For purposes of this Award, "Retirement" means the termination of employment of a Participant who is age 55 or older with at least ten years of Recognized Employment with the Company or any Affiliate other than by reason of (i) death or permanent long-term disability or (ii) Misconduct.

For purposes of this Award, "Recognized Employment" shall include only employment since the Participant's most recent date of hire by the Company or any Affiliate, and shall not include employment with a company acquired by UnitedHealth Group or any Affiliate before the date of such acquisition.

For purposes of this Award, "Misconduct" shall mean a Participant's (a) violation of, or failure to act upon or report known or suspected violations of, the Company's Principles of

3

Ethics and Integrity, or (b) commission of any illegal, fraudulent, or dishonest act or gross negligent or intentional misrepresentation in connection with the Participant's employment.

5.    Method of Exercise.  The Stock Appreciation Rights may be exercised with respect to Vested Shares by delivery to the Company of a written notice which shall state that Participant elects to exercise the Stock Appreciation Rights as to the number of Vested Shares specified in the notice as of the date specified in the notice.

6.    Restriction on Transfer.  During Participant's lifetime, the Stock Appreciation Rights shall be exercisable only by Participant.  Participant may not transfer the Stock Appreciation Rights except by will or by the laws of descent and distribution or pursuant to a qualified domestic relations order as defined by the Code or Title I of the Employee Retirement Income Security Act or the rules promulgated thereunder.  Any attempt to otherwise transfer the Stock Appreciation Rights shall be void.

7.    Termination.  The Stock Appreciation Rights granted pursuant to this Award shall terminate on the earlier to occur of (a) the date indicated above in the box labeled "Expiration Date" or (b) as provided in Section 4 above.

8.    Forfeiture of Stock Appreciation Rights and Shares.  This section sets forth circumstances under which Participant shall forfeit all or a portion of the Stock Appreciation Rights, or be required to repay the Company for the value realized in respect of all or a portion of the Stock Appreciation Rights.

(a)    Violation of Restrictive Covenants.  If Participant violates any provision of the Restrictive Covenants in Section 9, then (i) any unvested Stock Appreciation Rights and (ii) any Stock Appreciation Rights that vested within one year prior to Participant's termination of employment with the Company or any Affiliate or at any time after such termination of employment (the "Forfeited SARs") and that have not been exercised shall be immediately cancelled and rendered null and void without any payment therefor.  If any such Forfeited SARs have been exercised prior to Participant's violation of the Restrictive Covenants, Participant shall be required to repay or otherwise reimburse the Company, upon demand, an amount in cash or Common Stock having a value equal to the amount described in clause (i) or (ii), depending on whether the Participant still holds the Shares received upon exercise of the Forfeited SARs; (i) to the extent that such Shares have been sold, the aggregate proceeds received from such sale of Shares, and (ii) to the extent that such Shares have not been sold at the time Company demand is made, the aggregate Fair Market Value of such Shares on the date the Forfeited SARs were exercised.

(b)    In General.  This section does not constitute the Company's exclusive remedy for Participant's violation of the Restrictive Covenants.  The Company may seek any additional legal or equitable remedy, including injunctive relief, for any such violations.  The provisions in this section are essential economic conditions to the Company's grant of Stock Appreciation Rights to Participant.  By receiving the grant of Stock Appreciation Rights hereunder, Participant agrees that the Company may deduct from any amounts it owes Participant from time to time (such as wages or other compensation, deferred compensation

4

credits, vacation pay, any severance or other payments owed following a termination of employment, as well as any other amounts owed to the Participant by the Company) to the extent of any amounts Participant owes the Company under this section. The provisions of this section and any amounts repayable by Participant hereunder are intended to be in addition to any rights to repayment the Company may have under Section 304 of the Sarbanes-Oxley Act of 2002 and other applicable law.

   9. Restrictive Covenants. In consideration of the terms of this Award and Participant's access to Confidential Information, Participant agrees to the Restrictive Covenants set forth below. For purposes of the Restrictive Covenants, the "Company" means UnitedHealth Group and all of its subsidiaries and other affiliates.

   (a) Confidential Information. Participant has or will be given access to and provided with sensitive, confidential, proprietary and/or trade secret information (collectively, "Confidential Information") in the course of Participant's employment. Examples of Confidential Information include inventions, new product or marketing plans, business strategies and plans, merger and acquisition targets, financial and pricing information, computer programs, source codes, models and data bases, analytical models, customer lists and information, and supplier and vendor lists and information. Participant agrees not to disclose or use Confidential Information, either during or after Participant's employment with the Company, except as necessary to perform Participant's duties or as the Company may consent in writing.

   (b) Non-Solicitation. During Participant's employment and for the greater of two years after the termination of Participant's employment for any reason whatsoever or the period of time during which the Stock Appreciation Rights remain exercisable, Participant may not, without the Company's prior written consent, directly or indirectly, for Participant or for any other person or entity, as agent, employee, officer, director, consultant, owner, principal, partner or shareholder, or in any other individual or representative capacity:

     (i) Solicit any business competitive with the Company from any person or entity who (a) was a Company provider or customer within the 12 months before Participant's employment termination and with whom Participant had contact to further the Company's business, or for whom Participant provided services or supervised employees who provided those services, or (b) was a prospective provider or customer the Company solicited within the 12 months before Participant's employment termination and with whom Participant had contact for the purposes of soliciting the person or entity to become a provider or customer of the Company, or supervised employees who had those contacts.

     (ii) Hire, employ, recruit or solicit any Company employee or consultant.

     (iii) Induce or influence any Company employee, consultant, or provider to terminate his, her or its employment or other relationship with the Company.

     (iv) Assist anyone in any of the activities listed above.

(c)     Non-Competition. During Participant's employment and for the greater of one year after the termination of Participant's employment for any reason whatsoever or the period of time during which the Stock Appreciation Rights remain exercisable, Participant may not, without the Company's prior written consent, directly or indirectly, for Participant or for any other person or entity, as agent, employee, officer, director, consultant, owner, principal, partner or shareholder, or in any other individual or representative capacity:

> (i)      Engage in or participate in any activity that competes, directly or indirectly, with any Company product or service that Participant engaged in, participated in, or had Confidential Information about during Participant's employment.

> (ii)     Assist anyone in any of the activities listed above.

(d)     Because the Company's business competes on a nationwide basis, the Participant's obligations under this "Restrictive Covenants" section shall apply on a nationwide basis anywhere in the United States.

(e)     To the extent Participant and the Company agree at any time to enter into separate agreements containing restrictive covenants with different or inconsistent terms than those contained herein, Participant and the Company acknowledge and agree that such different or inconsistent terms shall not in any way affect or have relevance to the Restrictive Covenants contained herein.

By accepting this Stock Appreciation Right, Participant agrees that the provisions of this Restrictive Covenants section are reasonable and necessary to protect the legitimate interests of the Company.

10.     Adjustments to Stock Appreciation Rights. In the event that any dividend or other distribution (whether in the form of cash, shares of Common Stock, other securities or other property), recapitalization, stock split, reverse stock split, reorganization, merger, consolidation, split-up, spin-off, combination, repurchase or exchange of Common Stock or other securities of the Company or other similar corporate transaction or event affecting the Common Stock would be reasonably likely to result in the diminution or enlargement of any of the benefits or potential benefits intended to be made available under the Award (including, without limitation, the benefits or potential benefits of provisions relating to the term, vesting or exercisability of the Stock Appreciation Rights), the Committee shall, in such manner as it shall deem equitable or appropriate in order to prevent such diminution or enlargement of any such benefits or potential benefits, make adjustments to the Award, including adjustments in the number and type of Shares subject to the Stock Appreciation Rights; provided, however, that the number of shares of Common Stock into which the Stock Appreciation Rights may be exercised shall always be a whole number.

11.     Tax Matters.

(a)     In order to comply with all applicable federal, state and local tax laws or regulations, the Company may take such action as it deems appropriate to ensure that all applicable federal, state and local payroll, withholding, income or other taxes, which are the sole and absolute responsibility of Participant, are withheld or collected from Participant.

(b)     Upon each exercise of Stock Appreciation Rights hereunder, Participant will be deemed to have elected to satisfy Participant's minimum required federal, state, and local payroll, withholding, income or other tax withholding obligations arising from the exercise of Stock Appreciation Rights or the receipt of Issued Shares by having the Company withhold a portion of the Issued Shares otherwise to be delivered having a Fair Market Value equal to the amount of such taxes (but only to the extent of the minimum amount required to be withheld under applicable laws or regulations), unless, on or before the date of exercise, Participant notifies the Company that Participant has elected, and makes appropriate arrangements, to deliver cash, check (bank check, certified check or personal check) or money order payable to the Company.

12.    Miscellaneous.

(a)     This Award does not confer on Participant any right with respect to the continuance of any relationship with the Company or any Affiliate, nor will it interfere in any way with the right of the Company to terminate such relationship at any time.

(b)     Neither the Plan nor this Award shall create or be construed to create a trust or separate fund of any kind or a fiduciary relationship between the Company or any Affiliate and Participant or any other Person. To the extent that any Person acquires a right to receive payments from the Company or any Affiliate pursuant to an Award, such right shall be no greater than the right of any unsecured creditor of the Company or any Affiliate.

(c)     The Company shall not be required to issue or deliver any shares of Common Stock upon exercise of any Stock Appreciation Rights until the requirements of any federal or state securities laws, rules or regulations or other laws or rules (including the rules of any securities exchange) as may be determined by the Company to be applicable have been and continue to be satisfied (including an effective registration of the shares under federal and state security laws).

(d)     An original record of this Award and all the terms hereof, executed by the Company, is held on file by the Company. To the extent there is any conflict between the terms contained in this Award and the terms contained in the original held by the Company, the terms of the original held by the Company shall control.

(e)     If a court or arbitrator decides that any provision of this Award is invalid or overbroad, Participant agrees that the court or arbitrator should narrow such provision so that it is enforceable or, if narrowing is not possible or permissible, such provision should be considered severed and the other provisions of this Award should be unaffected.

7

(f)     Participant agrees that (i) legal remedies (money damages) for any breach of the Restrictive Covenants in Section 9 will be inadequate, (ii) the Company will suffer immediate and irreparable harm from any such breach, and (iii) the Company will be entitled to injunctive relief from a court in addition to any legal remedies the Company may seek in arbitration.

(g)     The Restrictive Covenants and the provisions regarding forfeiture of the Stock Appreciation Rights and Shares in this Award shall survive termination of the Stock Appreciation Rights.

(h)     The validity, construction and effect of this Award and any rules and regulations relating to this Award shall be determined in accordance with the laws of the State of Minnesota (without regard to its conflict of law principles).



UnitedHealth Group

### STOCK APPRECIATION RIGHTS AWARD
### (STOCK SETTLED)

Award Number:   Y2006714

| Award Date | Number of Shares | Grant Price | Expiration Date |
|---|---|---|---|
| 06/05/2008 | 3205 | $33.94 | 06/05/2018 |

THIS CERTIFIES THAT UnitedHealth Group Incorporated (the "Company") has on the Award Date specified above granted to

#### APARNA VALLURUPALLI

("Participant") stock appreciation rights (the "Stock Appreciation Rights") with respect to the number of shares of UnitedHealth Group Incorporated Common Stock, $.01 par value per share (the "Common Stock"), indicated above in the box labeled "Number of Shares" (the "Shares"). The initial value of each Share is indicated above in the box labeled "Grant Price." This Award represents the right to receive shares of Common Stock (the "Issued Shares") only when, and with respect to the number of Shares as to which, the Award has vested (the "Vested Shares"). This Award is subject to the terms and conditions set forth below and in the UnitedHealth Group Incorporated 2002 Stock Incentive Plan (the "Plan"). A copy of the Plan is available upon request. In the event of any conflict between the terms of the Plan and this Award, the terms of the Plan shall govern. Any terms not defined herein shall have the meaning set forth in the Plan.

\* \* \* \* \*

1.    Rights of the Participant with Respect to the Stock Appreciation Rights.

(a)    No Shareholder Rights. The Stock Appreciation Rights granted pursuant to this Award do not and shall not entitle Participant to any rights of a shareholder of Common Stock prior to the exercise of the Stock Appreciation Rights and the receipt of the Issued Shares in accordance with this Award. The rights of Participant with respect to this Award shall remain forfeitable at all times prior to the date on which such rights become vested in accordance with Section 2, 3 or 4 hereof.

(b)    Exercise of Stock Appreciation Rights; Issuance of Common Stock. No shares of Common Stock shall be issued to Participant prior to the date on which the Stock Appreciation Rights are vested in accordance with Sections 2, 3, or 4, and exercised in accordance with Section 5. Upon exercise of the Stock Appreciation Rights, Participant shall be entitled to receive a number of Issued Shares for each Vested Share with respect to which the Stock

Appreciation Rights are exercised equal to (i) the excess of the Fair Market Value of one Share on the date of exercise over the Grant Price, divided by (ii) the Fair Market Value of one Share on the date of exercise. The Issued Shares shall be issued in book-entry form, registered in Participant's name or in the name of Participant's legal representatives, beneficiaries or heirs, as the case may be. The Company will not deliver any fractional share of Common Stock but will pay, in lieu thereof, cash equal to the Fair Market Value of such fractional share.

2. Vesting. Subject to the terms and conditions of this Award, the Stock Appreciation Rights shall vest and may be exercised by Participant with respect to 25% of the Shares on each of the first, second, third and fourth anniversaries of the Award Date if Participant remains continuously employed by the Company or its subsidiaries until the respective vesting dates.

3. Early Vesting Upon Change in Control. Notwithstanding the other vesting provisions contained in Section 2, but subject to the other terms and conditions set forth herein, upon the effective date of a Change in Control, the Stock Appreciation Rights with respect to all of the Shares shall become immediately and unconditionally vested and exercisable. For purposes of this Award, a "Change in Control" shall mean the sale of all or substantially all of the Company's assets or any merger, reorganization, or exchange or tender offer which, in each case, will result in a change in the power to elect 50% or more of the members of the Board of Directors of the Company.

4. Forfeiture or Early Vesting Upon Termination of Employment.

(a) Termination of Employment Generally. If Participant ceases to be an employee of the Company or its subsidiaries for any reason (voluntary or involuntary) other than death or permanent long-term disability, or a termination that results in severance or separation pay being paid to Participant, then Participant may at any time within the Exercise Period (as defined below) exercise the Stock Appreciation Rights with respect to the Vested Shares on the date of the termination. Participant's Stock Appreciation Rights with respect to any unvested Shares shall be immediately and irrevocably forfeited on the date of termination.

(b) Death or Permanent Long-Term Disability. If Participant dies while employed by the Company or its subsidiaries, or if Participant's employment by the Company or its subsidiaries is terminated due to Participant's failure to return to work as the result of a permanent long-term disability which renders Participant incapable of performing his or her duties as determined under the provisions of the Company's long-term disability insurance program applicable to Participant, then (i) the Stock Appreciation Rights with respect to any unvested Shares shall immediately vest, and (ii) Participant (or Participant's personal representatives, administrators or guardians, as applicable, or any person or persons to whom the Stock Appreciation Rights are transferred by will or the applicable laws of descent and distribution) may, subject to Section 7, at any time within a period of five years after the Participant's death or termination of employment due to the Participant's failure to return to work as the result of a permanent long-term disability, or for such other longer period established at the discretion of the Committee or the Chief Executive Officer of the Company, exercise the Stock Appreciation Rights to the extent of the full number of Vested Shares.

2

(c)     Severance.  If Participant is entitled to severance under the Company's severance pay plan as in effect on the date hereof, then the Stock Appreciation Rights shall continue to vest for the period of such severance that Participant is eligible to receive.  If Participant is entitled to severance under an employment agreement entered into with the Company, then vesting of the Stock Appreciation Rights shall continue for the period of such severance that Participant is entitled to receive as of the date hereof.  If Participant is entitled to separation pay other than under the Company's severance pay plan or an employment agreement, then vesting of the Stock Appreciation Rights shall continue for the lesser of (i) the period Participant would have received payments under the severance pay plan as in effect on the date hereof, had Participant been eligible for such payments or (ii) the period of separation pay.  In either case, should Participant be paid in a lump sum versus bi-weekly payments, the Stock Appreciation Rights shall continue to vest for the period of time in which severance or separation pay would have been paid had it been paid bi-weekly.

(d)     For purposes of this Award, "Exercise Period" means the greater of (i) a period of three months after the date of termination of Participant's employment, (ii) if Participant is entitled to severance or separation pay, a period of three months after vesting ceases as provided in (c) above, or (iii) such other longer period established at the discretion of the Committee or the Chief Executive Officer of the Company.  Notwithstanding any other provision of this Agreement, the Stock Appreciation Rights shall in no event be exercisable to any extent or by any Person after the Expiration Date.

5.      Method of Exercise.  The Stock Appreciation Rights may be exercised with respect to Vested Shares by delivery to the Company of a written notice which shall state that Participant elects to exercise the Stock Appreciation Rights as to the number of Vested Shares specified in the notice as of the date specified in the notice.

6.      Restriction on Transfer.  During Participant's lifetime, the Stock Appreciation Rights shall be exercisable only by Participant.  Participant may not transfer the Stock Appreciation Rights except by will or by the laws of descent and distribution or pursuant to a qualified domestic relations order as defined by the Code or Title I of the Employee Retirement Income Security Act or the rules promulgated thereunder.  Any attempt to otherwise transfer the Stock Appreciation Rights shall be void.

7.      Termination.  The Stock Appreciation Rights granted pursuant to this Award shall terminate on the earlier to occur of (a) the date indicated above in the box labeled "Expiration Date" or (b) as provided in Section 4 above.

8.      Forfeiture of Stock Appreciation Rights and Shares.  This section sets forth circumstances under which Participant shall forfeit all or a portion of the Stock Appreciation Rights, or be required to repay the Company for the value realized in respect of all or a portion of the Stock Appreciation Rights.

(a)     Violation of Restrictive Covenants. If Participant violates any provision of the Restrictive Covenants in Section 9, then (i) any unvested Stock Appreciation Rights and (ii) any Stock Appreciation Rights that vested within one year prior to Participant's termination of employment with the Company or its subsidiaries or at any time after such termination of employment (the "Forfeited SARs") and that have not been exercised shall be immediately cancelled and rendered null and void without any payment therefor. If any such Forfeited SARs have been exercised prior to Participant's violation of the Restrictive Covenants, Participant shall be required to repay or otherwise reimburse the Company, upon demand, an amount in cash or Common Stock having a value equal to the amount described in clause (i) or (ii), depending on whether the Participant still holds the Shares received upon exercise of the Forfeited SARs; (i) to the extent that such Shares have been sold, the aggregate proceeds received from such sale of Shares, and (ii) to the extent that such Shares have not been sold at the time Company demand is made, the aggregate Fair Market Value of such Shares on the date the Forfeited SARs were exercised.

(b)     In General. This section does not constitute the Company's exclusive remedy for Participant's violation of the Restrictive Covenants. The Company may seek any additional legal or equitable remedy, including injunctive relief, for any such violations. The provisions in this section are essential economic conditions to the Company's grant of Stock Appreciation Rights to Participant. By receiving the grant of Stock Appreciation Rights hereunder, Participant agrees that the Company may deduct from any amounts it owes Participant from time to time (such as wages or other compensation, deferred compensation credits, vacation pay, any severance or other payments owed following a termination of employment, as well as any other amounts owed to the Participant by the Company) to the extent of any amounts Participant owes the Company under this section. The provisions of this section and any amounts repayable by Participant hereunder are intended to be in addition to any rights to repayment the Company may have under Section 304 of the Sarbanes-Oxley Act of 2002 and other applicable law.

9.     Restrictive Covenants. In consideration of the terms of this Award and Participant's access to Confidential Information, Participant agrees to the Restrictive Covenants set forth below. For purposes of the Restrictive Covenants, the "Company" means UnitedHealth Group and all of its subsidiaries and other affiliates.

(a)     Confidential Information. Participant has or will be given access to and provided with sensitive, confidential, proprietary and/or trade secret information (collectively, "Confidential Information") in the course of Participant's employment. Examples of Confidential Information include inventions, new product or marketing plans, business strategies and plans, merger and acquisition targets, financial and pricing information, computer programs, source codes, models and data bases, analytical models, customer lists and information, and supplier and vendor lists and information. Participant agrees not to disclose or use Confidential Information, either during or after Participant's employment with the Company, except as necessary to perform Participant's duties or as the Company may consent in writing.

(b)     Non-Solicitation. During Participant's employment and for the greater of two years after the termination of Participant's employment for any reason whatsoever or the period of time during which the Stock Appreciation Rights remain exercisable, Participant may not, without the Company's prior written consent, directly or indirectly, for Participant or for any

4

other person or entity, as agent, employee, officer, director, consultant, owner, principal, partner or shareholder, or in any other individual or representative capacity:

      (i)    Solicit any business competitive with the Company from any person or entity who (a) was a Company provider or customer within the 12 months before Participant's employment termination and with whom Participant had contact to further the Company's business, or for whom Participant provided services or supervised employees who provided those services, or (b) was a prospective provider or customer the Company solicited within the 12 months before Participant's employment termination and with whom Participant had contact for the purposes of soliciting the person or entity to become a provider or customer of the Company, or supervised employees who had those contacts.

      (ii)    Hire, employ, recruit or solicit any Company employee or consultant.

      (iii)    Induce or influence any Company employee, consultant, or provider to terminate his, her or its employment or other relationship with the Company.

      (iv)    Assist anyone in any of the activities listed above.

    (c)    Non-Competition. During Participant's employment and for the greater of one year after the termination of Participant's employment for any reason whatsoever or the period of time during which the which the Stock Appreciation Rights remain exercisable, Participant may not, without the Company's prior written consent, directly or indirectly, for Participant or for any other person or entity, as agent, employee, officer, director, consultant, owner, principal, partner or shareholder, or in any other individual or representative capacity:

      (i)    Engage in or participate in any activity that competes, directly or indirectly, with any Company product or service that Participant engaged in, participated in, or had Confidential Information about during Participant's employment.

      (ii)    Assist anyone in any of the activities listed above.

    (d)    Because the Company's business competes on a nationwide basis, the Participant's obligations under this "Restrictive Covenants" section shall apply on a nationwide basis anywhere in the United States.

    (e)    To the extent Participant and the Company agree at any time to enter into separate agreements containing restrictive covenants with different or inconsistent terms than those contained herein, Participant and the Company acknowledge and agree that such different or inconsistent terms shall not in any way affect or have relevance to the Restrictive Covenants contained herein.

By accepting this Stock Appreciation Right, Participant agrees that the provisions of this Restrictive Covenants section are reasonable and necessary to protect the legitimate interests of the Company.

      10.    Adjustments to Stock Appreciation Rights.  In the event that any dividend or other distribution (whether in the form of cash, shares of Common Stock, other securities or other property), recapitalization, stock split, reverse stock split, reorganization, merger, consolidation, split-up, spin-off, combination, repurchase or exchange of Common Stock or other securities of the Company or other similar corporate transaction or event affecting the Common Stock would be reasonably likely to result in the diminution or enlargement of any of the benefits or potential benefits intended to be made available under the Award (including, without limitation, the benefits or potential benefits of provisions relating to the term, vesting or exercisability of the Stock Appreciation Rights), the Committee shall, in such manner as it shall deem equitable or appropriate in order to prevent such diminution or enlargement of any such benefits or potential benefits, make adjustments to the Award, including adjustments in the number and type of Shares subject to the Stock Appreciation Rights; provided, however, that the number of shares of Common Stock into which the Stock Appreciation Rights may be exercised shall always be a whole number.

      11.    Tax Matters.

      (a)    In order to comply with all applicable federal, state and local tax laws or regulations, the Company may take such action as it deems appropriate to ensure that all applicable federal, state and local payroll, withholding, income or other taxes, which are the sole and absolute responsibility of Participant, are withheld or collected from Participant.

      (b)    Upon each exercise of Stock Appreciation Rights hereunder, Participant will be deemed to have elected to satisfy Participant's minimum required federal, state, and local payroll, withholding, income or other tax withholding obligations arising from the exercise of Stock Appreciation Rights or the receipt of Issued Shares by having the Company withhold a portion of the Issued Shares otherwise to be delivered having a Fair Market Value equal to the amount of such taxes (but only to the extent of the minimum amount required to be withheld under applicable laws or regulations), unless, on or before the date of exercise, Participant notifies the Company that Participant has elected, and makes appropriate arrangements, to deliver cash, check (bank check, certified check or personal check) or money order payable to the Company.

      12.    Miscellaneous.

      (a)    This Award does not confer on Participant any right with respect to the continuance of any relationship with the Company or its subsidiaries, nor will it interfere in any way with the right of the Company to terminate such relationship at any time.

      (b)    Neither the Plan nor this Award shall create or be construed to create a trust or separate fund of any kind or a fiduciary relationship between the Company or any Affiliate and Participant or any other Person.  To the extent that any Person acquires a right to receive

payments from the Company or any Affiliate pursuant to an Award, such right shall be no greater than the right of any unsecured creditor of the Company or any Affiliate.

(c)     The Company shall not be required to issue or deliver any shares of Common Stock upon exercise of any Stock Appreciation Rights until the requirements of any federal or state securities laws, rules or regulations or other laws or rules (including the rules of any securities exchange) as may be determined by the Company to be applicable have been and continue to be satisfied (including an effective registration of the shares under federal and state security laws).

(d)     An original record of this Award and all the terms hereof, executed by the Company, is held on file by the Company. To the extent there is any conflict between the terms contained in this Award and the terms contained in the original held by the Company, the terms of the original held by the Company shall control.

(e)     If a court or arbitrator decides that any provision of this Award is invalid or overbroad, Participant agrees that the court or arbitrator should narrow such provision so that it is enforceable or, if narrowing is not possible or permissible, such provision should be considered severed and the other provisions of this Award should be unaffected.

(f)     Participant agrees that (i) legal remedies (money damages) for any breach of the Restrictive Covenants in Section 9 will be inadequate, (ii) the Company will suffer immediate and irreparable harm from any such breach, and (iii) the Company will be entitled to injunctive relief from a court in addition to any legal remedies the Company may seek in arbitration.

(g)     The Restrictive Covenants and the provisions regarding forfeiture of the Stock Appreciation Rights and Shares in this Award shall survive termination of the Stock Appreciation Rights.

(h)     The validity, construction and effect of this Award and any rules and regulations relating to this Award shall be determined in accordance with the laws of the State of Minnesota (without regard to its conflict of law principles).

7

Exhibit E



### UnitedHealth Group
## RESTRICTED STOCK UNIT AWARD

Award Number:  WD220910

| Award Date | Number of Units | Final Vesting Date |
|------------|-----------------|--------------------|
| 02/09/2010 | 1516 | 02/09/2014 |

THIS CERTIFIES THAT UnitedHealth Group Incorporated (the "Company") has on the Award Date specified above granted to

### APARNA VALLURUPALLI

("Participant") an award (the "Award") to receive that number of restricted stock units (the "Restricted Stock Units") indicated above in the box labeled "Number of Units," each Restricted Stock Unit representing the right to receive one share of UnitedHealth Group Incorporated Common Stock, $.01 par value per share (the "Common Stock"), subject to certain restrictions and on the terms and conditions contained in this Award and the UnitedHealth Group Incorporated 2002 Stock Incentive Plan (the "Plan"). A copy of the Plan is available upon request. In the event of any conflict between the terms of the Plan and this Award, the terms of the Plan shall govern. Any terms not defined herein shall have the meaning set forth in the Plan.

\* \* \* \* \*

I.    Rights of the Participant with Respect to the Restricted Stock Units.

(a)    No Shareholder Rights. The Restricted Stock Units granted pursuant to this Award do not and shall not entitle Participant to any rights of a shareholder of Common Stock. The rights of Participant with respect to the Restricted Stock Units shall remain forfeitable at all times prior to the date on which such rights become vested, and the restrictions with respect to the Restricted Stock Units lapse, in accordance with Section 2, 3 or 4.

(b)    Conversion of Restricted Stock Units; Issuance of Common Stock. No shares of Common Stock shall be issued to Participant prior to the date on which the Restricted Stock Units vest, and the restrictions with respect to the Restricted Stock Units lapse, in accordance with Section 2, 3 or 4. Neither this Section 1(b) nor any action taken pursuant to or in accordance with this Section 1(b) shall be construed to create a trust of any kind. After any Restricted Stock Units vest pursuant to Section 2, 3 or 4, the Company shall promptly cause to be issued shares of Common Stock in book-entry form, registered in Participant's name or in the name of Participant's legal representatives, beneficiaries or heirs, as the case may be, in

payment of such vested whole Restricted Stock Units, but in any event, within the period ending on March 15th of the year following the year in which the vesting event occurs (which payment schedule is intended to comply with the "short-term deferral" exemption from the application of Section 409A of the Code), unless such payment is deferred in accordance with the terms and conditions of the Company's non-qualified compensation deferral plans. The value of any fractional Restricted Stock Unit shall be paid in cash at the time shares of Common Stock are delivered to Participant in payment of the Restricted Stock Units.

2. Vesting. Subject to the terms and conditions of this Award, 25% of the Restricted Stock Units shall vest, and the restrictions with respect to the Restricted Stock Units shall lapse, on each of the first, second, third and fourth anniversaries of the Award Date if Participant remains continuously employed by the Company or continues to serve on the Board of Directors of the Company until the respective vesting dates.

3. Early Vesting Upon Change in Control. Notwithstanding the other vesting provisions contained in Section 2, but subject to the other terms and conditions set forth herein, upon the effective date of a Change in Control, all of the Restricted Stock Units shall become immediately and unconditionally vested and exercisable, and the restrictions with respect to all of the Restricted Stock Units shall lapse. For purposes of this Award, a "Change in Control" shall mean the sale of all or substantially all of the Company's assets or any merger, reorganization, or exchange or tender offer which, in each case, will result in a change in the power to elect 50% or more of the members of the Board of Directors of the Company.

4. Termination of Employment.

(a) Termination of Employment Generally. If, prior to vesting of the Restricted Stock Units pursuant to Section 2 or 3, Participant ceases to be an employee of the Company or any Affiliate, or ceases to serve on the Board of Directors of the Company, for any reason (voluntary or involuntary) other than (i) death or permanent long-term disability, or (ii) a termination that results in severance or separation pay being paid to Participant, and at the time of such termination Participant is not eligible for Retirement (as defined below), then Participant's rights to all of the unvested Restricted Stock Units shall be immediately and irrevocably forfeited on the date of termination.

(b) Death or Permanent Long-Term Disability. If Participant dies while employed by the Company or any Affiliate, or if Participant's employment by the Company or any Affiliate is terminated due to Participant's failure to return to work as the result of a permanent long-term disability which renders Participant incapable of performing his or her duties as determined under the provisions of the Company's long-term disability insurance program applicable to Participant, then all unvested Restricted Stock Units shall become immediately vested, and the restrictions with respect to all of the Restricted Stock Units shall lapse, as of the date of such death or employment termination.

2

(c) Severance. If Participant is entitled to severance under the Company's severance pay plan as in effect on the date hereof and the Participant is not eligible for Retirement (as defined below) at the time of termination of employment, then the Restricted Stock Units shall continue to vest, and the restrictions with respect to the Restricted Stock Units shall continue to lapse, for the period of such severance that Participant is eligible to receive. If Participant is entitled to severance under an employment agreement entered into with the Company, then vesting of the Restricted Stock Units, and lapsing of their restrictions, shall continue for the period of such severance that Participant is entitled to receive as of the date hereof. If Participant is entitled to separation pay other than under the Company's severance pay plan or an employment agreement, then vesting of the Restricted Stock Units, and lapsing of their restrictions, shall continue for the lesser of (i) the period Participant would have received payments under the severance pay plan as in effect on the date hereof, had Participant been eligible for such payments or (ii) the period of separation pay. In any case, should Participant be paid in a lump sum versus bi-weekly payments, the Restricted Stock Units shall continue to vest for the period of time in which severance or separation pay would have been paid had it been paid bi-weekly. The rest of this Section 4(c) to the contrary notwithstanding, if any period of severance or separation pay described in Sections 4(c)(i), (ii) or (iii) is of a duration that would have the effect of causing any number of Restricted Stock Units to vest, and the restrictions with respect thereto to lapse, such that the underlying shares of Common Stock would be issued on a date that is after March 15th (the "Acceleration Date") of the year following the calendar year in which the termination of employment occurs, then that number of Restricted Stock Units will automatically vest and the restrictions with respect thereto shall lapse within such time to ensure that the underlying shares of Common Stock will be issued to Participant on or prior to the Acceleration Date.

(d) Retirement. If the Participant's employment by the Company or any Affiliate is terminated and at the time of termination is eligible for Retirement, then the vesting of the Restricted Stock Units shall continue as if such termination of employment had not occurred, subject to provisions set out in the section entitled "Forfeiture of Restricted Stock Units and Shares of Common Stock" below; provided the Committee may accelerate the lapse of restrictions on such Restricted Stock Units to such an earlier date as the Committee may establish in its discretion.

(e) For purposes of this Award, "Retirement" means the termination of employment of a Participant who is age 55 or older with at least ten years of Recognized Employment with the Company or any Affiliate other than by reason of (i) death or permanent long-term disability or (ii) Misconduct.

For purposes of this Award, "Recognized Employment" shall include only employment since the Participant's most recent date of hire by the Company or any Affiliate, and shall not include employment with a company acquired by UnitedHealth Group or any Affiliate before the date of such acquisition.

For purposes of this Award, "Misconduct" shall mean a Participant's (a) violation of, or failure to act upon or report known or suspected violations of, the

3

Company's Principles of Ethics and Integrity, or (b) commission of any illegal, fraudulent, or dishonest act or gross negligent or intentional misrepresentation in connection with the Participant's employment.

5.    <u>Restriction on Transfer</u>. Participant may not transfer the Restricted Stock Units except by will or by the laws of descent and distribution or pursuant to a qualified domestic relations order as defined by the Code or Title I of the Employee Retirement Income Security Act or the rules promulgated thereunder. Any attempt to otherwise transfer the Restricted Stock Units shall be void.

6.    <u>Special Restriction on Transfer for Certain Participants</u>. If Participant is an officer of the Company within the meaning of Section 16 of the Securities Exchange Act of 1934 and Rule 16a-1 issued thereunder, as such status is reasonably determined from time to time by the Board of Directors of the Company (a "Section 16 Officer"), at any time that shares of Common Stock are issued upon the vesting of Restricted Stock Units and the Company has theretofore communicated Participant's status as a Section 16 Officer to Participant, the following special transfer restrictions apply to Participant's Award. One third (1/3) of the net number of any shares of Common Stock issued to Participant upon the vesting of Restricted Stock Units at a time when Participant is a Section 16 Officer (including any shares of Common Stock or other securities into which such shares may be converted or exchanged as a result of any adjustment made pursuant to this Award or Section 7 of the Plan) must be retained, and may not be sold or otherwise transferred, for a period of at least one year following the applicable vesting date. For purposes of this Award, the "net number of any shares of Common Stock issued" shall mean the number of shares issued upon vesting of Restricted Stock Units after reduction for any shares of Common Stock withheld by or tendered to the Company, or sold on the market, to cover any federal, state, local or other payroll, withholding, income or other applicable tax withholding required in connection with the issuance of the shares. The restrictions of this Section 6 are in addition to, and not in lieu of, the restrictions imposed under other Company policies and applicable laws.

7.    <u>Forfeiture of Restricted Stock Units and Shares of Common Stock</u>. This section sets forth circumstances under which Participant shall forfeit all or a portion of the Restricted Stock Units, or be required to repay the Company for the value realized in respect of all or a portion of the Restricted Stock Units:

   (a)    <u>Violation of Restrictive Covenants</u>. If Participant violates any provision of the Restrictive Covenants set forth in Section 8 below, then any unvested Restricted Stock Units shall be immediately and irrevocably forfeited without any payment therefor. In addition, for any Restricted Stock Units that vested within one year prior to Participant's termination of employment with the Company or any Affiliate or at any time after such termination of employment, the Participant shall be required, upon demand, to repay or otherwise reimburse the Company (including by forfeiting any deferred compensation credits in respect of such Restricted Stock Units under the Company's non-qualified compensation deferral plans) an amount having a value equal to the aggregate Fair Market Value of the shares of Common

Stock underlying such Restricted Stock Units on the date the Restricted Stock Units became vested.

(b)  In General.  This section does not constitute the Company's exclusive remedy for Participant's violation of the Restrictive Covenants. The Company may seek any additional legal or equitable remedy, including injunctive relief, for any such violations. The provisions in this section are essential economic conditions to the Company's grant of Restricted Stock Units to Participant.  By receiving the grant of Restricted Stock Units hereunder, Participant agrees that the Company may deduct from any amounts it owes Participant from time to time (such as wages or other compensation, deferred compensation credits, vacation pay, any severance or other payments owed following a termination of employment, as well as any other amounts owed to the Participant by the Company) to the extent of any amounts Participant owes the Company under this section. The provisions of this section and any amounts repayable by Participant hereunder are intended to be in addition to any rights to repayment the Company may have under Section 304 of the Sarbanes-Oxley Act of 2002 and other applicable law.

8.    Restrictive Covenants.    In consideration of the terms of this Award and Participant's access to Confidential Information, Participant agrees to the Restrictive Covenants set forth below.  For purposes of the Restrictive Covenants, the "Company" means UnitedHealth Group and all of its subsidiaries and other affiliates.

(a)    Confidential Information.  Participant has or will be given access to and provided with sensitive, confidential, proprietary and/or trade secret information (collectively, "Confidential Information") in the course of Participant's employment.    Examples of Confidential Information include inventions, new product or marketing plans, business strategies and plans, merger and acquisition targets, financial and pricing information, computer programs, source codes, models and data bases, analytical models, customer lists and information, and supplier and vendor lists and information.  Participant agrees not to disclose or use Confidential Information, either during or after Participant's employment with the Company, except as necessary to perform Participant's duties or as the Company may consent in writing.

(b)  . Non-Solicitation.  During Participant's employment and for two years after the later of (i) the termination of Participant's employment for any reason whatsoever or (ii) the last scheduled vesting date under Section 4, Participant may not, without the Company's prior written consent, directly or indirectly, for Participant or for any other person or entity, as agent, employee, officer, director, consultant, owner, principal, partner or shareholder, or in any other individual or representative capacity:

(i)    Solicit any business competitive with the Company from any person or entity who (a) was a Company provider or customer within the 12 months before Participant's employment termination and with whom Participant had contact to further the Company's business, or for whom Participant provided services or supervised

5

employees who provided those services, or (b) was a prospective provider or customer the Company solicited within the 12 months before Participant's employment termination and with whom Participant had contact for the purposes of soliciting the person or entity to become a provider or customer of the Company, or supervised employees who had those contacts.

(ii)     Hire, employ, recruit or solicit any Company employee or consultant.

(iii)    Induce or influence any Company employee, consultant, or provider to terminate his, her or its employment or other relationship with the Company.

(iv)     Assist anyone in any of the activities listed above.

(c)     Non-Competition.  During Participant's employment and for one year after the later of (i) the termination of Participant's employment for any reason whatsoever or (ii) the last scheduled vesting date under Section 4, Participant may not, without the Company's prior written consent, directly or indirectly, for Participant or for any other person or entity, as agent, employee, officer, director, consultant, owner, principal, partner or shareholder, or in any other individual or representative capacity:

(i)      Engage in or participate in any activity that competes, directly or indirectly, with any Company product or service that Participant engaged in, participated in, or had Confidential Information about during Participant's employment.

(ii)     Assist anyone in any of the activities listed above.

(d)     Because the Company's business competes on a nationwide basis, the Participant's obligations under this "Restrictive Covenants" section shall apply on a nationwide basis anywhere in the United States.

(e)     To the extent Participant and the Company agree at any time to enter into separate agreements containing restrictive covenants with different or inconsistent terms than those contained herein, Participant and the Company acknowledge and agree that such different or inconsistent terms shall not in any way affect or have relevance to the Restrictive Covenants contained herein.

By accepting this Restricted Stock Unit Award, Participant agrees that the provisions of this Restrictive Covenants section are reasonable and necessary to protect the legitimate interests of the Company.

6

9.   Adjustments to Restricted Stock Units.   In the event that any dividend or other distribution (whether in the form of cash, shares of Common Stock, other securities or other property), recapitalization, stock split, reverse stock split, reorganization, merger, consolidation, split-up, spin-off, combination, repurchase or exchange of Common Stock or other securities of the Company or other similar corporate transaction or event affecting the Common Stock would be reasonably likely to result in the diminution or enlargement of any of the benefits or potential benefits intended to be made available under the Award (including, without limitation, the benefits or potential benefits of provisions relating to the vesting of the Restricted Stock Units), the Committee shall, in such manner as it shall deem equitable or appropriate in order to prevent such diminution or enlargement of any such benefits or potential benefits, make adjustments to the Award, including adjustments in the number and type of shares of Common Stock Participant would have received upon vesting of the Restricted Stock Units; provided, however, that the number of shares into which the Restricted Stock Units may be converted shall always be a whole number.

10.   Tax Matters.

(a)   In order to comply with all applicable federal, state and local tax laws or regulations, the Company may take such action as it deems appropriate to ensure that all applicable federal, state and local payroll, withholding, income or other taxes, which are the sole and absolute responsibility of Participant, are withheld or collected from Participant.

(b)   On each applicable vesting date, Participant will be deemed to have elected to satisfy Participant's minimum required federal, state, and local payroll, withholding, income or other tax withholding obligations arising from the receipt of shares or the lapse of restrictions relating to the Restricted Stock Units, by having the Company withhold a portion of the shares of Common Stock otherwise to be delivered having a Fair Market Value equal to the amount of such taxes (but only to the extent of the minimum amount required to be withheld under applicable laws or regulations), unless, on or before the applicable vesting date, Participant notifies the Company that Participant has elected, and makes appropriate arrangements, to deliver cash, check (bank check, certified check or personal check) or money order payable to the Company.

11.   Miscellaneous.

(a)   This Award does not confer on Participant any right with respect to the continuance of any relationship with the Company or any Affiliate, nor will it interfere in any way with the right of the Company to terminate such relationship at any time.

(b)   Neither the Plan nor this Award shall create or be construed to create a trust or separate fund of any kind or a fiduciary relationship between the Company or any Affiliate and Participant or any other Person.  To the extent that any Person acquires a right to receive payments from the Company or any Affiliate pursuant to an Award, such right shall be no greater than the right of any unsecured creditor of the Company or any Affiliate.

7

(c)   The Company shall not be required to deliver any shares of Common Stock upon the vesting of any Restricted Stock Units until the requirements of any federal or state securities laws, rules or regulations or other laws or rules (including the rules of any securities exchange) as may be determined by the Company to be applicable have been and continue to be satisfied (including an effective registration of the shares under federal and state securities laws).

(d)   An original record of this Award and all the terms hereof, executed by the Company, is held on file by the Company. To the extent there is any conflict between the terms contained in this Award and the terms contained in the original held by the Company, the terms of the original held by the Company shall control.

(e)   If a court or arbitrator decides that any provision of this Award is invalid or overbroad, Participant agrees that the court or arbitrator should narrow such provision so that it is enforceable or, if narrowing is not possible or permissible, such provision should be considered severed and the other provisions of this Award should be unaffected.

(f)   Participant agrees that (i) legal remedies (money damages) for any breach of the Restrictive Covenants in Section 8 will be inadequate, (ii) the Company will suffer immediate and irreparable harm from any such breach, and (iii) the Company will be entitled to injunctive relief from a court in addition to any legal remedies the Company may seek in arbitration.

(g)   The Restrictive Covenants in this Award and the provisions regarding the forfeiture of Restricted Stock Units and shares of Common Stock shall survive termination of the Restricted Stock Units.

(h)   The validity, construction and effect of this Award and any rules and regulations relating to this Award shall be determined in accordance with the laws of the State of Minnesota (without regard to its conflict of law principles).



### UnitedHealth Group
### RESTRICTED STOCK UNIT AWARD

Award Number:  WA201706

| Award Date | Number of Units | Final Vesting Date |
|------------|-----------------|--------------------|
| 02/03/2009 | 1538 | 02/03/2013 |

THIS CERTIFIES THAT UnitedHealth Group Incorporated (the "Company") has on the Award Date specified above granted to

### APARNA VALLURUPALLI

("Participant") an award (the "Award") to receive that number of restricted stock units (the "Restricted Stock Units") indicated above in the box labeled "Number of Units," each Restricted Stock Unit representing the right to receive one share of UnitedHealth Group Incorporated Common Stock, $.01 par value per share (the "Common Stock"), subject to certain restrictions and on the terms and conditions contained in this Award and the UnitedHealth Group Incorporated 2002 Stock Incentive Plan (the "Plan"). A copy of the Plan is available upon request. In the event of any conflict between the terms of the Plan and this Award, the terms of the Plan shall govern. Any terms not defined herein shall have the meaning set forth in the Plan.

\* \* \* \* \*

1.   Rights of the Participant with Respect to the Restricted Stock Units.

(a)   No Shareholder Rights. The Restricted Stock Units granted pursuant to this Award do not and shall not entitle Participant to any rights of a shareholder of Common Stock. The rights of Participant with respect to the Restricted Stock Units shall remain forfeitable at all times prior to the date on which such rights become vested, and the restrictions with respect to the Restricted Stock Units lapse, in accordance with Section 2, 3 or 4.

(b)   Conversion of Restricted Stock Units; Issuance of Common Stock. No shares of Common Stock shall be issued to Participant prior to the date on which the Restricted Stock Units vest, and the restrictions with respect to the Restricted Stock Units lapse, in accordance with Section 2, 3 or 4. Neither this Section 1(b) nor any action taken pursuant to or in accordance with this Section 1(b) shall be construed to create a trust of any kind. After any Restricted Stock Units vest pursuant to Section 2, 3 or 4, the Company shall promptly cause to be issued shares of Common Stock in book-entry form, registered in Participant's name or in the name of Participant's legal representatives, beneficiaries or heirs, as the case may be, in

payment of such vested whole Restricted Stock Units, but in any event, within the period ending on March 15th of the year following the year in which the vesting event occurs (which payment schedule is intended to comply with the "short-term deferral" exemption from the application of Section 409A of the Code), unless such payment is deferred in accordance with the terms and conditions of the Company's non-qualified compensation deferral plans. The value of any fractional Restricted Stock Unit shall be paid in cash at the time shares of Common Stock are delivered to Participant in payment of the Restricted Stock Units.

2.    Vesting. Subject to the terms and conditions of this Award, 25% of the Restricted Stock Units shall vest, and the restrictions with respect to the Restricted Stock Units shall lapse, on each of the first, second, third and fourth anniversaries of the Award Date if Participant remains continuously employed by the Company or continues to serve on the Board of Directors of the Company until the respective vesting dates.

3.    Early Vesting Upon Change in Control. Notwithstanding the other vesting provisions contained in Section 2, but subject to the other terms and conditions set forth herein, upon the effective date of a Change in Control, all of the Restricted Stock Units shall become immediately and unconditionally vested and exercisable, and the restrictions with respect to all of the Restricted Stock Units shall lapse. For purposes of this Award, a "Change in Control" shall mean the sale of all or substantially all of the Company's assets or any merger, reorganization, or exchange or tender offer which, in each case, will result in a change in the power to elect 50% or more of the members of the Board of Directors of the Company.

4.    Termination of Employment.

(a)    Termination of Employment Generally. If, prior to vesting of the Restricted Stock Units pursuant to Section 2 or 3, Participant ceases to be an employee of the Company or any Affiliate, or ceases to serve on the Board of Directors of the Company, for any reason (voluntary or involuntary) other than (i) death or permanent long-term disability, or (ii) a termination that results in severance or separation pay being paid to Participant, and at the time of such termination Participant is not eligible for Retirement (as defined below), then Participant's rights to all of the unvested Restricted Stock Units shall be immediately and irrevocably forfeited on the date of termination.

(b)    Death or Permanent Long-Term Disability. If Participant dies while employed by the Company or any Affiliate, or if Participant's employment by the Company or any Affiliate is terminated due to Participant's failure to return to work as the result of a permanent long-term disability which renders Participant incapable of performing his or her duties as determined under the provisions of the Company's long-term disability insurance program applicable to Participant, then all unvested Restricted Stock Units shall become immediately vested, and the restrictions with respect to all of the Restricted Stock Units shall lapse, as of the date of such death or employment termination.

2

(c)   Severance. If Participant is entitled to severance under the Company's severance pay plan as in effect on the date hereof and the Participant is not eligible for Retirement (as defined below) at the time of termination of employment, then the Restricted Stock Units shall continue to vest, and the restrictions with respect to the Restricted Stock Units shall continue to lapse, for the period of such severance that Participant is eligible to receive. If Participant is entitled to severance under an employment agreement entered into with the Company, then vesting of the Restricted Stock Units, and lapsing of their restrictions, shall continue for the period of such severance that Participant is entitled to receive as of the date hereof. If Participant is entitled to separation pay other than under the Company's severance pay plan or an employment agreement, then vesting of the Restricted Stock Units, and lapsing of their restrictions, shall continue for the lesser of (i) the period Participant would have received payments under the severance pay plan as in effect on the date hereof, had Participant been eligible for such payments or (ii) the period of separation pay. In any case, should Participant be paid in a lump sum versus bi-weekly payments, the Restricted Stock Units shall continue to vest for the period of time in which severance or separation pay would have been paid had it been paid bi-weekly. The rest of this Section 4(c) to the contrary notwithstanding, if any period of severance or separation pay described in Sections 4(c)(i), (ii) or (iii) is of a duration that would have the effect of causing any number of Restricted Stock Units to vest, and the restrictions with respect thereto to lapse, such that the underlying shares of Common Stock would be issued on a date that is after March 15th (the "Acceleration Date") of the year following the calendar year in which the termination of employment occurs, then that number of Restricted Stock Units will automatically vest and the restrictions with respect thereto shall lapse within such time to ensure that the underlying shares of Common Stock will be issued to Participant on or prior to the Acceleration Date.

(d)   Retirement. If the Participant's employment by the Company or any Affiliate is terminated and at the time of termination is eligible for Retirement, then the vesting of the Restricted Stock Units shall continue as if such termination of employment had not occurred, subject to provisions set out in the section entitled "Forfeiture of Restricted Stock Units and Shares of Common Stock" below; provided the Committee or the Chief Executive Officer of the Company may accelerate the lapse of restrictions on such Restricted Stock Units to such an earlier date as the Committee or the Chief Executive Officer of the Company may establish in its or his or her discretion.

(e)   For purposes of this Award, "Retirement" means the termination of employment of a Participant who is age 55 or older with at least ten years of Recognized Employment with the Company or any Affiliate other than by reason of (i) death or permanent long-term disability or (ii) Misconduct.

For purposes of this Award, "Recognized Employment" shall include only employment since the Participant's most recent date of hire by the Company or any Affiliate, and shall not include employment with a company acquired by UnitedHealth Group or any Affiliate before the date of such acquisition.

3

For purposes of this Award, "Misconduct" shall mean a Participant's (a) violation of, or failure to act upon or report known or suspected violations of, the Company's Principles of Ethics and Integrity, or (b) commission of any illegal, fraudulent, or dishonest act or gross negligent or intentional misrepresentation in connection with the Participant's employment.

5.    Restriction on Transfer.   Participant may not transfer the Restricted Stock Units except by will or by the laws of descent and distribution or pursuant to a qualified domestic relations order as defined by the Code or Title I of the Employee Retirement Income Security Act or the rules promulgated thereunder. Any attempt to otherwise transfer the Restricted Stock Units shall be void.

6.    Forfeiture of Restricted Stock Units and Shares of Common Stock.  This section sets forth circumstances under which Participant shall forfeit all or a portion of the Restricted Stock Units, or be required to repay the Company for the value realized in respect of all or a portion of the Restricted Stock Units.

(a)    Violation of Restrictive Covenants.  If Participant violates any provision of the Restrictive Covenants set forth in Section 7 below, then any unvested Restricted Stock Units shall be immediately and irrevocably forfeited without any payment therefor. In addition, for any Restricted Stock Units that vested within one year prior to Participant's termination of employment with the Company or any Affiliate or at any time after such termination of employment, the Participant shall be required, upon demand, to repay or otherwise reimburse the Company (including by forfeiting any deferred compensation credits in respect of such Restricted Stock Units under the Company's non-qualified compensation deferral plans) an amount having a value equal to the aggregate Fair Market Value of the shares of Common Stock underlying such Restricted Stock Units on the date the Restricted Stock Units became vested.

(b)    In General.  This section does not constitute the Company's exclusive remedy for Participant's violation of the Restrictive Covenants. The Company may seek any additional legal or equitable remedy, including injunctive relief, for any such violations. The provisions in this section are essential economic conditions to the Company's grant of Restricted Stock Units to Participant. By receiving the grant of Restricted Stock Units hereunder, Participant agrees that the Company may deduct from any amounts it owes Participant from time to time (such as wages or other compensation, deferred compensation credits, vacation pay, any severance or other payments owed following a termination of employment, as well as any other amounts owed to the Participant by the Company) to the extent of any amounts Participant owes the Company under this section. The provisions of this section and any amounts repayable by Participant hereunder are intended to be in addition to any rights to repayment the Company may have under Section 304 of the Sarbanes-Oxley Act of 2002 and other applicable law.

7.    Restrictive Covenants.   In consideration of the terms of this Award and Participant's access to Confidential Information, Participant agrees to the Restrictive

4

Covenants set forth below. For purposes of the Restrictive Covenants, the "Company" means UnitedHealth Group and all of its subsidiaries and other affiliates.

(a)   Confidential Information.   Participant has or will be given access to and provided with sensitive, confidential, proprietary and/or trade secret information (collectively, "Confidential Information") in the course of Participant's employment.   Examples of Confidential Information include inventions, new product or marketing plans, business strategies and plans, merger and acquisition targets, financial and pricing information, computer programs, source codes, models and data bases, analytical models, customer lists and information, and supplier and vendor lists and information. Participant agrees not to disclose or use Confidential Information, either during or after Participant's employment with the Company, except as necessary to perform Participant's duties or as the Company may consent in writing.

(b)   Non-Solicitation.   During Participant's employment and for two years after the later of (i) the termination of Participant's employment for any reason whatsoever or (ii) the last scheduled vesting date under Section 4, Participant may not, without the Company's prior written consent, directly or indirectly, for Participant or for any other person or entity, as agent, employee, officer, director, consultant, owner, principal, partner or shareholder, or in any other individual or representative capacity:

      (i)     Solicit any business competitive with the Company from any person or entity who (a) was a Company provider or customer within the 12 months before Participant's employment termination and with whom Participant had contact to further the Company's business, or for whom Participant provided services or supervised employees who provided those services, or (b) was a prospective provider or customer the Company solicited within the 12 months before Participant's employment termination and with whom Participant had contact for the purposes of soliciting the person or entity to become a provider or customer of the Company, or supervised employees who had those contacts.

      (ii)    Hire, employ, recruit or solicit any Company employee or consultant.

      (iii)   Induce or influence any Company employee, consultant, or provider to terminate his, her or its employment or other relationship with the Company.

      (iv)   Assist anyone in any of the activities listed above.

(c)   Non-Competition.   During Participant's employment and for one year after the later of (i) the termination of Participant's employment for any reason whatsoever or (ii) the last scheduled vesting date under Section 4, Participant may not, without the Company's prior written consent, directly or indirectly, for

Participant or for any other person or entity, as agent, employee, officer, director, consultant, owner, principal, partner or shareholder, or in any other individual or representative capacity:

    (i)    Engage in or participate in any activity that competes, directly or indirectly, with any Company product or service that Participant engaged in, participated in, or had Confidential Information about during Participant's employment.

    (ii)    Assist anyone in any of the activities listed above.

(d)    Because the Company's business competes on a nationwide basis, the Participant's obligations under this "Restrictive Covenants" section shall apply on a nationwide basis anywhere in the United States.

(e)    To the extent Participant and the Company agree at any time to enter into separate agreements containing restrictive covenants with different or inconsistent terms than those contained herein, Participant and the Company acknowledge and agree that such different or inconsistent terms shall not in any way affect or have relevance to the Restrictive Covenants contained herein.

By accepting this Restricted Stock Unit Award, Participant agrees that the provisions of this Restrictive Covenants section are reasonable and necessary to protect the legitimate interests of the Company.

8.    Adjustments to Restricted Stock Units. In the event that any dividend or other distribution (whether in the form of cash, shares of Common Stock, other securities or other property), recapitalization, stock split, reverse stock split, reorganization, merger, consolidation, split-up, spin-off, combination, repurchase or exchange of Common Stock or other securities of the Company or other similar corporate transaction or event affecting the Common Stock would be reasonably likely to result in the diminution or enlargement of any of the benefits or potential benefits intended to be made available under the Award (including, without limitation, the benefits or potential benefits of provisions relating to the vesting of the Restricted Stock Units), the Committee shall, in such manner as it shall deem equitable or appropriate in order to prevent such diminution or enlargement of any such benefits or potential benefits, make adjustments to the Award, including adjustments in the number and type of shares of Common Stock Participant would have received upon vesting of the Restricted Stock Units; provided, however, that the number of shares into which the Restricted Stock Units may be converted shall always be a whole number.

9.    Tax Matters.

(a)    In order to comply with all applicable federal, state and local tax laws or regulations, the Company may take such action as it deems appropriate to ensure

6

that all applicable federal, state and local payroll, withholding, income or other taxes, which are the sole and absolute responsibility of Participant, are withheld or collected from Participant.

(b) On each applicable vesting date, Participant will be deemed to have elected to satisfy Participant's minimum required federal, state, and local payroll, withholding, income or other tax withholding obligations arising from the receipt of shares or the lapse of restrictions relating to the Restricted Stock Units, by having the Company withhold a portion of the shares of Common Stock otherwise to be delivered having a Fair Market Value equal to the amount of such taxes (but only to the extent of the minimum amount required to be withheld under applicable laws or regulations), unless, on or before the applicable vesting date, Participant notifies the Company that Participant has elected, and makes appropriate arrangements, to deliver cash, check (bank check, certified check or personal check) or money order payable to the Company.

10.    Miscellaneous.

(a) This Award does not confer on Participant any right with respect to the continuance of any relationship with the Company or any Affiliate, nor will it interfere in any way with the right of the Company to terminate such relationship at any time.

(b) Neither the Plan nor this Award shall create or be construed to create a trust or separate fund of any kind or a fiduciary relationship between the Company or any Affiliate and Participant or any other Person. To the extent that any Person acquires a right to receive payments from the Company or any Affiliate pursuant to an Award, such right shall be no greater than the right of any unsecured creditor of the Company or any Affiliate.

(c) The Company shall not be required to deliver any shares of Common Stock upon the vesting of any Restricted Stock Units until the requirements of any federal or state securities laws, rules or regulations or other laws or rules (including the rules of any securities exchange) as may be determined by the Company to be applicable have been and continue to be satisfied (including an effective registration of the shares under federal and state securities laws).

(d) An original record of this Award and all the terms hereof, executed by the Company, is held on file by the Company. To the extent there is any conflict between the terms contained in this Award and the terms contained in the original held by the Company, the terms of the original held by the Company shall control.

(e) If a court or arbitrator decides that any provision of this Award is invalid or overbroad, Participant agrees that the court or arbitrator should narrow such provision so that it is enforceable or, if narrowing is not possible or permissible, such provision should be considered severed and the other provisions of this Award should be unaffected.

7

(f)   Participant agrees that (i) legal remedies (money damages) for any breach of the Restrictive Covenants in Section 7 will be inadequate, (ii) the Company will suffer immediate and irreparable harm from any such breach, and (iii) the Company will be entitled to injunctive relief from a court in addition to any legal remedies the Company may seek in arbitration.

(g)   The Restrictive Covenants in this Award and the provisions regarding the forfeiture of Restricted Stock Units and shares of Common Stock shall survive termination of the Restricted Stock Units.

(h)   The validity, construction and effect of this Award and any rules and regulations relating to this Award shall be determined in accordance with the laws of the State of Minnesota (without regard to its conflict of law principles).

8



UnitedHealth Group

## RESTRICTED STOCK UNIT AWARD

Award Number: W2006714

| Award Date | Number of Units | Final Vesting Date |
|---|---|---|
| 06/05/2008 | 1721 | 06/05/2012 |

THIS CERTIFIES THAT UnitedHealth Group Incorporated (the "Company") has on the Award Date specified above granted to

### APARNA VALLURUPALLI

("Participant") an award (the "Award") to receive that number of restricted stock units (the "Restricted Stock Units") indicated above in the box labeled "Number of Units," each Restricted Stock Unit representing the right to receive one share of UnitedHealth Group Incorporated Common Stock, $.01 par value per share (the "Common Stock"), subject to certain restrictions and on the terms and conditions contained in this Award and the UnitedHealth Group Incorporated 2002 Stock Incentive Plan (the "Plan"). A copy of the Plan is available upon request. In the event of any conflict between the terms of the Plan and this Award, the terms of the Plan shall govern. Any terms not defined herein shall have the meaning set forth in the Plan.

\* \* \* \* \*

1.      Rights of the Participant with Respect to the Restricted Stock Units.

(a)      No Shareholder Rights. The Restricted Stock Units granted pursuant to this Award do not and shall not entitle Participant to any rights of a shareholder of Common Stock. The rights of Participant with respect to the Restricted Stock Units shall remain forfeitable at all times prior to the date on which such rights become vested, and the restrictions with respect to the Restricted Stock Units lapse, in accordance with Section 2, 3 or 4.

(b)      Conversion of Restricted Stock Units; Issuance of Common Stock. No shares of Common Stock shall be issued to Participant prior to the date on which the Restricted Stock Units vest, and the restrictions with respect to the Restricted Stock Units lapse, in accordance with Section 2, 3 or 4. Neither this Section 1(b) nor any action taken pursuant to or in accordance with this Section 1(b) shall be construed to create a trust of any kind. After any Restricted Stock Units vest pursuant to Section 2, 3 or 4, the Company shall promptly cause to be issued shares of Common Stock in book-entry form, registered in Participant's name or in the name of Participant's legal representatives,

beneficiaries or heirs, as the case may be, in payment of such vested whole Restricted Stock Units, but in any event, within the period ending on March 15th of the year following the year in which the vesting event occurs (which payment schedule is intended to comply with the "short-term deferral" exemption from the application of Section 409A of the Code), unless such payment is deferred in accordance with the terms and conditions of the Company's non-qualified compensation deferral plans. The value of any fractional Restricted Stock Unit shall be paid in cash at the time shares of Common Stock are delivered to Participant in payment of the Restricted Stock Units.

2.     Vesting. Subject to the terms and conditions of this Award, 25% of the Restricted Stock Units shall vest, and the restrictions with respect to the Restricted Stock Units shall lapse, on each of the first, second, third and fourth anniversaries of the Award Date if Participant remains continuously employed by the Company or continues to serve on the Board of Directors of the Company until the respective vesting dates.

3.     Early Vesting Upon Change in Control. Notwithstanding the other vesting provisions contained in Section 2, but subject to the other terms and conditions set forth herein, upon the effective date of a Change in Control, all of the Restricted Stock Units shall become immediately and unconditionally vested and exercisable, and the restrictions with respect to all of the Restricted Stock Units shall lapse. For purposes of this Award, a "Change in Control" shall mean the sale of all or substantially all of the Company's assets or any merger, reorganization, or exchange or tender offer which, in each case, will result in a change in the power to elect 50% or more of the members of the Board of Directors of the Company.

4.     Termination of Employment.

(a)     Termination of Employment Generally. If, prior to vesting of the Restricted Stock Units pursuant to Section 2 or 3, Participant ceases to be an employee of the Company or its subsidiaries, or ceases to serve on the Board of Directors of the Company, for any reason (voluntary or involuntary) other than death or permanent long-term disability, or a termination that results in severance or separation pay being paid to Participant, then Participant's rights to all of the unvested Restricted Stock Units shall be immediately and irrevocably forfeited on the date of termination.

(b)     Death or Permanent Long-Term Disability. If Participant dies while employed by the Company or its subsidiaries, or if Participant's employment by the Company or its subsidiaries is terminated due to Participant's failure to return to work as the result of a permanent long-term disability which renders Participant incapable of performing his or her duties as determined under the provisions of the Company's long-term disability insurance program applicable to Participant, then all unvested Restricted Stock Units shall become immediately vested, and the restrictions with respect to all of the Restricted Stock Units shall lapse, as of the date of such death or employment termination.

(c)     Severance. If Participant is entitled to severance under the Company's severance pay plan as in effect on the date hereof, then the Restricted Stock Units shall

2

continue to vest, and the restrictions with respect to the Restricted Stock Units shall continue to lapse, for the period of such severance that Participant is eligible to receive. If Participant is entitled to severance under an employment agreement entered into with the Company, then vesting of the Restricted Stock Units, and lapsing of their restrictions, shall continue for the period of such severance that Participant is entitled to receive as of the date hereof. If Participant is entitled to separation pay other than under the Company's severance pay plan or an employment agreement, then vesting of the Restricted Stock Units, and lapsing of their restrictions, shall continue for the lesser of (i) the period Participant would have received payments under the severance pay plan as in effect on the date hereof, had Participant been eligible for such payments or (ii) the period of separation pay. In any case, should Participant be paid in a lump sum versus bi-weekly payments, the Restricted Stock Units shall continue to vest for the period of time in which severance or separation pay would have been paid had it been paid bi-weekly. The rest of this Section 4(c) to the contrary notwithstanding, if any period of severance or separation pay described in Sections 4(c)(i), (ii) or (iii) is of a duration that would have the effect of causing any number of Restricted Stock Units to vest, and the restrictions with respect thereto to lapse, such that the underlying shares of Common Stock would be issued on a date that is after March 15th (the "Acceleration Date") of the year following the calendar year in which the termination of employment occurs, then that number of Restricted Stock Units will automatically vest and the restrictions with respect thereto shall lapse within such time to ensure that the underlying shares of Common Stock will be issued to Participant on or prior to the Acceleration Date.

5.    Restriction on Transfer. Participant may not transfer the Restricted Stock Units except by will or by the laws of descent and distribution or pursuant to a qualified domestic relations order as defined by the Code or Title 1 of the Employee Retirement Income Security Act or the rules promulgated thereunder. Any attempt to otherwise transfer the Restricted Stock Units shall be void.

6.    Forfeiture of Restricted Stock Units and Shares of Common Stock. This section sets forth circumstances under which Participant shall forfeit all or a portion of the Restricted Stock Units, or be required to repay the Company for the value realized in respect of all or a portion of the Restricted Stock Units.

(a)    Violation of Restrictive Covenants. If Participant violates any provision of the Restrictive Covenants set forth in Section 7 below, then any unvested Restricted Stock Units shall be immediately and irrevocably forfeited without any payment therefor. In addition, for any Restricted Stock Units that vested within one year prior to Participant's termination of employment with the Company or its subsidiaries or at any time after such termination of employment, the Participant shall be required, upon demand, to repay or otherwise reimburse the Company (including by forfeiting any deferred compensation credits in respect of such Restricted Stock Units under the Company's non-qualified compensation deferral plans) an amount having a value equal to the aggregate Fair Market Value of the shares of Common Stock underlying such Restricted Stock Units on the date the Restricted Stock Units became vested.

3

(b)     In General. This section does not constitute the Company's exclusive remedy for Participant's violation of the Restrictive Covenants. The Company may seek any additional legal or equitable remedy, including injunctive relief, for any such violations. The provisions in this section are essential economic conditions to the Company's grant of Restricted Stock Units to Participant. By receiving the grant of Restricted Stock Units hereunder, Participant agrees that the Company may deduct from any amounts it owes Participant from time to time (such as wages or other compensation, deferred compensation credits, vacation pay, any severance or other payments owed following a termination of employment, as well as any other amounts owed to the Participant by the Company) to the extent of any amounts Participant owes the Company under this section. The provisions of this section and any amounts repayable by Participant hereunder are intended to be in addition to any rights to repayment the Company may have under Section 304 of the Sarbanes-Oxley Act of 2002 and other applicable law.

7.     Restrictive Covenants. In consideration of the terms of this Award and Participant's access to Confidential Information, Participant agrees to the Restrictive Covenants set forth below. For purposes of the Restrictive Covenants, the "Company" means UnitedHealth Group and all of its subsidiaries and other affiliates.

(a)     Confidential Information. Participant has or will be given access to and provided with sensitive, confidential, proprietary and/or trade secret information (collectively, "Confidential Information") in the course of Participant's employment. Examples of Confidential Information include inventions, new product or marketing plans, business strategies and plans, merger and acquisition targets, financial and pricing information, computer programs, source codes, models and data bases, analytical models, customer lists and information, and supplier and vendor lists and information. Participant agrees not to disclose or use Confidential Information, either during or after Participant's employment with the Company, except as necessary to perform Participant's duties or as the Company may consent in writing.

(b)     Non-Solicitation. During Participant's employment and for two years after the later of (i) the termination of Participant's employment for any reason whatsoever or (ii) the last scheduled vesting date under Section 4, Participant may not, without the Company's prior written consent, directly or indirectly, for Participant or for any other person or entity, as agent, employee, officer, director, consultant, owner, principal, partner or shareholder, or in any other individual or representative capacity:

(i)     Solicit any business competitive with the Company from any person or entity who (a) was a Company provider or customer within the 12 months before Participant's employment termination and with whom Participant had contact to further the Company's business, or for whom Participant provided services or supervised employees who provided those services, or (b) was a prospective provider or customer the Company solicited within the 12 months before Participant's employment termination and with whom Participant had contact for the purposes of soliciting the person or

4

entity to become a provider or customer of the Company, or supervised employees who had those contacts.

(ii) Hire, employ, recruit or solicit any Company employee or consultant.

(iii) Induce or influence any Company employee, consultant, or provider to terminate his, her or its employment or other relationship with the Company.

(iv) Assist anyone in any of the activities listed above.

(c) Non-Competition. During Participant's employment and for one year after the later of (i) the termination of Participant's employment for any reason whatsoever or (ii) the last scheduled vesting date under Section 4, Participant may not, without the Company's prior written consent, directly or indirectly, for Participant or for any other person or entity, as agent, employee, officer, director, consultant, owner, principal, partner or shareholder, or in any other individual or representative capacity:

(i) Engage in or participate in any activity that competes, directly or indirectly, with any Company product or service that Participant engaged in, participated in, or had Confidential Information about during Participant's employment.

(ii) Assist anyone in any of the activities listed above.

(d) Because the Company's business competes on a nationwide basis, the Participant's obligations under this "Restrictive Covenants" section shall apply on a nationwide basis anywhere in the United States.

(e) To the extent Participant and the Company agree at any time to enter into separate agreements containing restrictive covenants with different or inconsistent terms than those contained herein, Participant and the Company acknowledge and agree that such different or inconsistent terms shall not in any way affect or have relevance to the Restrictive Covenants contained herein.

By accepting this Restricted Stock Unit Award, Participant agrees that the provisions of this Restrictive Covenants section are reasonable and necessary to protect the legitimate interests of the Company.

8. Adjustments to Restricted Stock Units: In the event that any dividend or other distribution (whether in the form of cash, shares of Common Stock, other securities or other property), recapitalization, stock split, reverse stock split, reorganization, merger, consolidation, split-up, spin-off, combination, repurchase or exchange of Common Stock or other securities of the Company or other similar corporate transaction or event affecting the Common Stock would be reasonably likely to result in the diminution or enlargement of any of the benefits or potential benefits intended to be made available

5

under the Award (including, without limitation, the benefits or potential benefits of provisions relating to the vesting of the Restricted Stock Units), the Committee shall, in such manner as it shall deem equitable or appropriate in order to prevent such diminution or enlargement of any such benefits or potential benefits, make adjustments to the Award, including adjustments in the number and type of shares of Common Stock Participant would have received upon vesting of the Restricted Stock Units; provided, however, that the number of shares into which the Restricted Stock Units may be converted shall always be a whole number.

9.      Tax Matters.

(a)      In order to comply with all applicable federal, state and local tax laws or regulations, the Company may take such action as it deems appropriate to ensure that all applicable federal, state and local payroll, withholding, income or other taxes, which are the sole and absolute responsibility of Participant, are withheld or collected from Participant.

(b)      On each applicable vesting date, Participant will be deemed to have elected to satisfy Participant's minimum required federal, state, and local payroll, withholding, income or other tax withholding obligations arising from the receipt of shares or the lapse of restrictions relating to the Restricted Stock Units, by having the Company withhold a portion of the shares of Common Stock otherwise to be delivered having a Fair Market Value equal to the amount of such taxes (but only to the extent of the minimum amount required to be withheld under applicable laws or regulations), unless, on or before the applicable vesting date, Participant notifies the Company that Participant has elected, and makes appropriate arrangements, to deliver cash, check (bank check, certified check or personal check) or money order payable to the Company.

10.      Miscellaneous.

(a)      This Award does not confer on Participant any right with respect to the continuance of any relationship with the Company or its subsidiaries, nor will it interfere in any way with the right of the Company to terminate such relationship at any time.

(b)      Neither the Plan nor this Award shall create or be construed to create a trust or separate fund of any kind or a fiduciary relationship between the Company or any Affiliate and Participant or any other Person. To the extent that any Person acquires a right to receive payments from the Company or any Affiliate pursuant to an Award, such right shall be no greater than the right of any unsecured creditor of the Company or any Affiliate.

(c)      The Company shall not be required to deliver any shares of Common Stock upon the vesting of any Restricted Stock Units until the requirements of any federal or state securities laws, rules or regulations or other laws or rules (including the rules of any securities exchange) as may be determined by the Company to be applicable have been and continue to be satisfied (including an effective registration of the shares under federal and state securities laws).

6

(d)      An original record of this Award and all the terms hereof, executed by the Company, is held on file by the Company. To the extent there is any conflict between the terms contained in this Award and the terms contained in the original held by the Company, the terms of the original held by the Company shall control.

(e)      If a court or arbitrator decides that any provision of this Award is invalid or overbroad, Participant agrees that the court or arbitrator should narrow such provision so that it is enforceable or, if narrowing is not possible or permissible, such provision should be considered severed and the other provisions of this Award should be unaffected.

(f)      Participant agrees that (i) legal remedies (money damages) for any breach of the Restrictive Covenants in Section 7 will be inadequate, (ii) the Company will suffer immediate and irreparable harm from any such breach, and (iii) the Company will be entitled to injunctive relief from a court in addition to any legal remedies the Company may seek in arbitration.

(g)      The Restrictive Covenants in this Award and the provisions regarding the forfeiture of Restricted Stock Units and shares of Common Stock shall survive termination of the Restricted Stock Units.

(h)      The validity, construction and effect of this Award and any rules and regulations relating to this Award shall be determined in accordance with the laws of the State of Minnesota (without regard to its conflict of law principles).

Exhibit F



UnitedHealth Group™

# Principles of Integrity & Compliance and
# Employee Handbook Acknowledgement Form

## PRINCIPLES OF INTEGRITY & COMPLIANCE

I understand that it is of the highest importance to UnitedHealth Group Incorporated and its affiliated companies and subsidiaries ("UnitedHealth Group" or "Company") to conduct its business and operations in compliance with applicable law and sound business ethics. I understand that it is my obligation to comply with UnitedHealth Group's Principles of Integrity and Compliance ("Principles"), including the obligation to report to the Company any violations of the law, the Company's contractual obligations, or any of the Company's policies, including the Principles. I will carry out my responsibilities for UnitedHealth Group in accordance with the applicable law and the Company's contracts and policies.

I acknowledge I have received a brochure that describes the Principles. I understand the most current version of the Principles is available on the Integrity and Compliance Web site on Frontier, UnitedHealth Group's intranet (from Frontier, select *Corporate Departments*, then *Integrity & Compliance*, then *Principles of I&C*). I also understand that I am responsible for reviewing the Principles promptly upon my employment with UnitedHealth Group, whenever I have questions about appropriate business conduct, and at least annually during my employment. If I do not have access to Frontier and my manager has not provided me with a paper copy of the Principles, I will follow the instructions in the brochure to request a paper version of the Principles for my review and reference.

## EMPLOYEE HANDBOOK

I also acknowledge that I am responsible for reading the UnitedHealth Group Employee Handbook ("Employee Handbook") promptly upon beginning employment with the Company. I understand this document contains important information regarding the general employment policies of the Company and my obligations as an employee. I will carry out my responsibilities for UnitedHealth Group in accordance with the applicable policies set forth in the Employee Handbook.

I understand that the most current version of the Employee Handbook is available on Frontier (from Frontier, select *HRdirect*, then *Knowledge Base*, then *Employee Handbook*) or on the Internet (go to https://unitedhrdirect.com, then select *Knowledge Base*, then *Employee Handbook*). I also understand that I am responsible for reviewing the Employee Handbook promptly upon my employment with UnitedHealth Group, whenever I have questions about employment related matters, and at least annually during my employment. If, for any reason, I do not have access to the online Employee Handbook, I will request that my manager provide me with this information.

## AT-WILL EMPLOYMENT

I understand that the provisions in the Employee Handbook are guidelines, and, except for the provisions of the Employment Arbitration Policy, do not establish a contract or any particular terms or condition of employment between UnitedHealth Group and myself. None of the policies constitute or are intended to constitute a promise of employment. I further understand that UnitedHealth Group may periodically, at its discretion, change, rescind, or add to any policy, benefit or practice with or without prior notice.

I understand that the employment relationship is "at will" and is based upon the mutual consent of UnitedHealth Group and myself. Accordingly, I agree that UnitedHealth Group or I may terminate the employment relationship at any time and for any reason, with or without notice or prior discipline. I understand that only the Chief Executive Officer or the Senior Executive of Human Resources, in a written and signed document, have the authority to make a binding contract or promise relating to employment or to modify "at-will" employment for any employee under any circumstance.

## SPECIAL ACKNOWLEDGEMENTS

I acknowledge that I will specifically review the policies referenced below promptly upon beginning employment with UnitedHealth Group and I agree to abide by these policies:

**Sexual and Other Harassment** - Harassment based on age, race, gender, color, religion, national origin, disability, marital status, covered veteran status, sexual orientation, status with respect to public assistance, or any other characteristic protected under state, federal or local law is prohibited in any form at the workplace, at work related functions, anywhere UnitedHealth Group employees are performing their jobs, or which occurs outside of work but affects the workplace. Employees who believe they are being harassed must immediately report the incident to their manager, HRdirect, or the Corporate Compliance Helpline. Retaliation against any employee who reports a suspected incident of harassment is strictly prohibited. I understand UnitedHealth Group's prohibition against harassment, the procedure for reporting incidents of harassment, and UnitedHealth Group's prohibition against retaliation, and I agree to abide by these policies.

**Confidentiality and Data Security** - I acknowledge that in carrying out my assigned responsibilities as an employee of UnitedHealth Group, I will be given access to sensitive, confidential, proprietary and/or trade secret information owned by UnitedHealth Group and others. Such information includes the following, by way of example: inventions, new product or

marketing plans, business strategies and plans, detailed financial information and pricing information, computer programs, models and data bases (including, without limitation, source codes), designs, analytical models, customer lists and customer information, supplier and vendor lists, and supplier and vendor information.

I further acknowledge that I may be given access to physician, provider and member specific data or information that is considered sensitive and confidential by such persons and UnitedHealth Group.

I agree that I will not disclose or use this sensitive, confidential, proprietary and trade secret information at any time, either during or after the term of my employment, except at the request of UnitedHealth Group. I also understand that this sensitive, confidential, proprietary and trade secret information includes not only that information which is contained in written or digitized Company documents but also includes all such information which I may commit to memory during the course of my job.

**E-mail, Telephone and Internet Monitoring** – I understand that UnitedHealth Group may provide me with access to e-mail, telephone extensions and the Internet for the purpose of performing the duties and responsibilities of my position. I acknowledge that UnitedHealth Group may monitor both the volume and content of my e-mail, telephone and Internet transmissions in a manner consistent with federal and state laws.

## OWNERSHIP OF INVENTIONS

I agree that I will, both during and after my employment, promptly disclose in writing to UnitedHealth Group and I agree to assign and hereby assign to UnitedHealth Group all rights (including copyrights and patent rights) I may have in any invention, computer program, discovery, idea, writing, improvement, process, technique or other works (collectively called "Inventions") created or conceived by me during my employment with UnitedHealth Group which:

- relates in any manner to the actual or anticipated business, research, or development of UnitedHealth Group;
- results from work assigned to or performed by me for UnitedHealth Group; and/or
- is conceived of or made with the use of UnitedHealth Group's systems, equipment, supplies, materials, facilities, computer programs, confidential information and/or trade secret information.

I will at all times, even after termination of my employment, do whatever UnitedHealth Group reasonably requests of me to assign any Inventions to UnitedHealth Group that were created or conceived by me during my employment with UnitedHealth Group and to assist UnitedHealth Group in filing patent applications for any Inventions.

This agreement does not apply to Inventions that meet the following criteria:

- No UnitedHealth Group equipment, supplies, facilities or confidential, proprietary or trade secret information was used in its creation;
- It was developed entirely on my own time;
- At the time of conception or reduction to practice, it does not relate directly to UnitedHealth Group's business;
- At the time of conception or reduction to practice, it does not relate to UnitedHealth Group's actual or demonstrably anticipated research or development; and
- It does not result from any work performed by me for UnitedHealth Group.

## PROHIBITION AGAINST HIRING AND RECRUITING

During my employment with UnitedHealth Group and for the one-year period following termination of my employment, I agree that I will not, directly or indirectly, hire or employ any employee of UnitedHealth Group, or recruit, solicit or induce (or in any way assist another in recruiting, soliciting or inducing) any employee or consultant of UnitedHealth Group to terminate his or her employment or other relationship with UnitedHealth Group.

I also acknowledge that this covenant and the above restriction on using the Company's sensitive, confidential, proprietary and trade secret information are necessary to protect the legitimate business interests of the Company and to avoid disruption of the Company's business.

## REVISIONS

No revisions to this Acknowledgement are effective unless agreed to in writing by an officer of the Company.

| Date: 8/14/2003 | Employee Signature: A. Abburi |
| Location: 14 NB, HARTFORD, CT | Employee Name (please print): APARNA ABBURI |
| | Employee Identification Number: 000357939 |